## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| In re:  the Application of:<br><br>TEXAS KEYSTONE INC., Applicant,<br><br>pursuant to 28 U.S.C. § 1782 to issue subpoenas upon UBS AG and Christopher Pinho for the taking of a deposition and the production of documents for use in a foreign proceeding. | Case No. 3-12-mc-00041-MRK<br><br><br>June 21, 2012 |

## BRIEF IN SUPPORT OF TEXAS KEYSTONE INC.'S
## MOTION TO COMPEL PRODUCTION OF DOCUMENTS

# TABLE OF CONTENTS

**Page**

NATURE OF THE CASE ........................................................................................ 1

ARGUMENT .......................................................................................................... 3

I.      Items of Discovery Sought................................................................. 3

II.     Excalibur's Privilege Claims Should Be Decided By This Court. ........................ 4

III.    Excalibur Cannot Claim The Protection Of The Attorney-Client Privilege.......... 4

      A.    Excalibur Has Not Established That Eric Wempen Was Acting As Its Attorney. ................................................................................. 6

      B.    Even If Eric Wempen Was Acting As Excalibur's Attorney, There Is Subject-Matter Waiver Through Selective Production......................... 8

      C.    Documents On UBS's Server Cannot Be Privileged.............................. 11

IV.    Excalibur Has Waived The Protections Of The Work Product Doctrine. ........... 14

V.     Excalibur's Privilege Log Does Not Substantiate Its Privilege Claims.............. 15

VI.    English Law Does Not Protect The UBS Documents From Disclosure.............. 17

      A.    Excalibur Has Failed To Establish By Authoritative Proof That English Law Protects The Documents.................................................... 18

      B.    Excalibur Has Failed To Establish By Authoritative Proof That An English Court Would Reject The Evidence. ........................................... 19

CONCLUSION...................................................................................................... 20

## TABLE OF AUTHORITIES

**Page**

CASES

*Attorney-General v Guardian Newspapers Ltd*
(No 2) [1990] 1 AC 109 ..................................................................................................18

*Bank of America, N.A. v. Terra Nova Ins. Co.,*
212 F.R.D. 166 (S.D.N.Y. 2002) ...............................................................................14, 15

*Bolorin v. Borrino,*
248 F.R.D. 93 (D. Conn. 2008) ......................................................................................15

*BristolMyers Squibb Co. v. Rhone-Poulenc Rorer, Inc.,*
No. 95 Civ. 8833(RPP), 1997 WL 801454 (S.D.N.Y. Dec. 31, 1997) ...................................15

*Dunlop Slazenger International Ltd v Joe Bloggs Sports Ltd*
[2003] EWCA Civ 901 ..................................................................................................18

*FDIC v. Wachovia Ins. Servs., Inc.,*
241 F.R.D. 104 (D. Conn. 2007) .....................................................................................14

*Fulham Leisure Holdings Ltd v Nicholson Graham Jones*
[2–0] EWHC 158 ..........................................................................................................18

*Goldstein v. Colborne Acquisition Co., LLC,*
No. 10 C 6861, 2012 U.S. Dist. LEXIS 75743 (N.D. Ill. June 1, 2012) .........................11, 13

*Hardy v. New York News Inc.,*
114 F.R.D. 633 (S.D.N.Y. 1987) .....................................................................................12

*Horace Mann Ins. Co. v. Nationwide Mut. Ins. Co.,*
240 F.R.D. 44 (D. Conn. 2007) .......................................................................................16

*In re Application of Malev Hungarian Airlines,*
964 F.2d 97 (2d Cir. 1991) ...............................................................................................4

*In re Esses,*
101 F.3d 873 (2d Cir. 1996) .......................................................................................19, 20

*In re Federation Internationale de Basketball,*
117 F. Supp. 2d 403 (S.D.N.Y. 2000) ...............................................................................5

*In re Grand Jury Subpoenas Dated Mar. 19, 2002 & Aug. 2, 2002,*
318 F.3d 379 (2d Cir. 2003) ...........................................................................................14

*In re Horowitz*,
   482 F.2d 72 (2d Cir. 1973)......................................................................................5, 11, 12

*In re Houck*,
   No. 3:96 MC 419 EBB, 1997 WL 1052017 (D. Conn. Oct. 10, 1997) ...................................18

*In re Philips*,
   No. M 19-96, 2004 U.S. Dist. LEXIS 16426 (S.D.N.Y. Aug. 18, 2004) ...............................19

*In re Reserve Fund Securities & Derivative Litigation*,
   275 F.R.D. 154 (S.D.N.Y. 2011) ...................................................................................11, 13

*In re von Bulow*,
   828 F.2d 94 (2d Cir. 1987).......................................................................................................6

*Intel Corp. v. Advanced Micro Devices, Inc.*,
   542 U.S. 241 (2004)................................................................................................................19

*Lagace v. New England Central R.R.*,
   No. 3:06CV1317(RNC), 2007 WL 2889465 (D. Conn. Sept. 28, 2007)...............................14

*Long v. Marubeni Am. Corp.*,
   No. 05 Civ. 639, 2006 U.S. Dist. LEXIS 76594 (S.D.N.Y. Oct. 19, 2006) ...................11, 13

*Metallgesellschaft v. Hodapp*,
   121 F.3d 77 (2d Cir. 1997)............................................................................................ passim

*Mid-Continent Cas. Co. v. Eland Energy, Inc.*,
   No. 3: 7 MC 78 (CFD), 2007 WL 948154 (D. Conn. Mar. 26, 2007)...................................15

*Nokia Corp. v. InterDigital Tech. Corp.*,
   [2004] EWHC 2920 ................................................................................................................19

*Pritchard v. County of Erie*,
   473 F.3d 413 (2d Cir. 2007)..................................................................................................6, 8

*Ratliff v. Davis Polk & Wardwell*,
   354 F.3d 165 (2d Cir. 2003)......................................................................................................5

*Robbins & Myers, Inc. v. J.M. Huber Corp.*,
   274 F.R.D. 63 (W.D.N.Y. 2011)..................................................................................... passim

*Salomon Bros. Treasury Litig. v. Steinhardt Partners, L.P.*,
   9 F.3d 230 (2d Cir. 1993) .......................................................................................................14

*United States v. Bein*,
   728 F.2d 107 (2d Cir. 1984)..............................................................................................5, 6, 8

*United States v. Doe (In re Grand Jury Proceedings)*,
  219 F.3d 175 (2d Cir. 2000)...........................................................................11, 14

*United States v. Mejia*,
  655 F.3d 126 (2d Cir. 2011)....................................................................................5

*United States v. Nixon*,
  418 U.S. 683 (1974)...............................................................................................14

**STATUTES**

28 U.S.C. § 1782 .............................................................................................. passim

**OTHER AUTHORITIES**

D. Conn. L. Civ. R. 26(e)(5) .................................................................................15

Texas Keystone Inc. ("Texas Keystone") respectfully requests that this Court compel the production of documents withheld by UBS AG ("UBS").  UBS has withheld these documents at the direction of, and on the basis of privilege claims asserted by, Excalibur Ventures LLC ("Excalibur").  But, Excalibur has not met its burden of proving that these documents were confidential communications or (with respect to its attorney-client privilege claims) that the communications were between counsel and client for the purpose of providing legal advice.  In any event, Excalibur has waived any privilege that might apply by extensively disclosing, in the litigation between Texas Keystone and Excalibur pending in London and in this action, the very kinds of documents it now claims are privileged, addressing the same subject matters.  It has also waived privilege by leaving these documents for years in the possession of UBS, a third party.

## NATURE OF THE CASE

This motion to compel relates to the subpoena that Texas Keystone issued to UBS pursuant to 28 U.S.C. § 1782.  *See* (Docket Nos. 1 (1782 Application), 1-1 (Subpoena).)  On April 3, 2012, Texas Keystone applied to this Court for an order to take discovery of UBS and UBS employee Christopher Pinho pursuant to 28 U.S.C. § 1782 in connection with a lawsuit pending before the High Court of Justice, Queen's Bench Division, Commercial Court, in London, England (Claim No. 2010 Folio 1517) (the "UK Litigation").  *See* (Docket No. 1 (1782 Application).)  On April 16, 2012, this Court granted Texas Keystone's request to take discovery. (Docket No. 4 (Order).)

In the UK Litigation, Excalibur has sued Texas Keystone, Gulf Keystone Petroleum Ltd., Gulf Keystone Petroleum International Ltd., and Gulf Keystone Petroleum (UK) Ltd. ("Defendants"), alleging that Defendants failed to comply with the terms of a collaboration agreement between Excalibur and Texas Keystone to bid for and eventually exploit petroleum concessions in Iraqi Kurdistan.  *See generally* Mem. of Law in Support of Texas Keystone's

Application for an Order Permitting Discovery Pursuant to 28 U.S.C. § 1782 (Docket No. 1-3) at 1-3.  Among their defenses, Defendants assert that Excalibur was ineligible under the Kurdish Oil and Gas Law to participate in petroleum exploration and production activities and, in any event, Excalibur did not and could not obtain financing for its alleged interest in the concessions. *See id.*  The Collaboration Agreement applies New York law.  *See* Ex. G (Collaboration Agreement).

Excalibur is, essentially, a one-man operation, run by its principal, Rex Wempen ("Rex"). Rex Wempen's brother, Eric Wempen ("Eric"), is employed as a tax lawyer at UBS.  While employed at UBS, Eric regularly used his UBS e-mail address to exchange e-mails with Rex about issues including Excalibur's formation, contracts between Excalibur and Texas Keystone, and securing financing for Excalibur's alleged interest in the Kurdish petroleum concessions. Indeed, with Eric's encouragement and participation, Excalibur at one time sought funds from UBS to finance its alleged interest in the concessions.

Because of Eric Wempen's regular use of his UBS e-mail address to communicate with Rex, and because Excalibur approached UBS for financing, UBS has custody and control of documents relevant to the legal and factual issues in the UK Litigation.  Excalibur has declined to produce these documents in the UK Litigation, asserting that Excalibur does not have custody or control over them.  *See* Ex. C (March 8, 2008 Letter from Clifford Chance) at 5.  Texas Keystone has, therefore, requested by subpoena that UBS produce, among other things, all documents related to Excalibur, Texas Keystone, and/or the Gulf entities, as well as all documents concerning UBS's investment or potential investment in Excalibur, the Gulf entities, or the Kurdish concessions.

Before UBS responded to Texas Keystone's document requests, however, Excalibur asserted a right to review UBS's responsive documents in order to assert privilege claims over those documents.  As a courtesy, Texas Keystone did not oppose that review at the time, without waiving any rights concerning whether or not a legitimate claim of privilege could be made with respect to these documents.

Excalibur has asserted privilege claims over 280 documents, more than one-third of the 806 documents from Eric Wempen's e-mail account that UBS has identified as responsive.  *See* Ex. A (Excalibur Priv. Log).  All of the allegedly privileged documents are, and always have been, housed on UBS's server.  Although very few of the documents (and none of the withheld documents) had anything to do with UBS business, they were sent or received by Eric Wempen through UBS's e-mail system, using his UBS e-mail address.  As Excalibur has expressly admitted, it does not have custody or control of these documents, nor does Eric.  *See* Ex. C at 5. Rather, the documents are, and always have been, in the custody and control of UBS.

Moreover, Excalibur has produced in the UK Litigation, and has allowed UBS to produce in this action, numerous communications between Rex Wempen and Eric Wempen.  A number of these communications appear to fit the descriptions (albeit vague ones) of withheld documents in Excalibur's privilege log and address the very same subject matters.

## ARGUMENT

### I.      Items of Discovery Sought

Texas Keystone seeks discovery of all documents listed in Excalibur's privilege log, with the exception of ubs-ag00000237 and ubs-ag00000249 (which do not appear, from their descriptions, to be relevant to the issues in the UK Litigation).

The documents Texas Keystone seeks are responsive to Texas Keystone's subpoena and do not fall under any legal privilege or protection:

- In the case of documents assertedly protected by the attorney-client privilege, there is no privilege because (1) the communications were not between an attorney and client for the purpose of providing legal advice; (2) the privilege has been waived through selective disclosure; and (3) the documents were sent and received through UBS's server, vitiating any confidentiality as a matter of law.

- In the case of documents assertedly protected by the work product doctrine, there is no protection because the protection has been waived through selective disclosure.

- In the case of all documents, Excalibur's privilege log is inadequate because it fails provide sufficient detail for this Court to ascertain privilege or for Texas Keystone meaningfully to evaluate Excalibur's privilege claims.  It also fails to disclose the author, recipient(s) and date of many documents.

## II.   Excalibur's Privilege Claims Should Be Decided By This Court.

As an initial matter, the case law leaves no doubt that this Court is the proper tribunal for deciding this discovery issue.  As the Second Circuit held in *In re Application of Malev Hungarian Airlines*, 964 F.2d 97 (2d Cir. 1991), "a district court may not refuse a request for discovery pursuant to § 1782 because a foreign tribunal has not yet had the opportunity to consider the discovery request."  *Metallgesellschaft v. Hodapp*, 121 F.3d 77, 80 (2d Cir. 1997) (citing *Malev*, 964 F.2d at 100 (holding that district court abused its discretion where it denied discovery request under § 1782 because the applicant had not first sought discovery through the foreign tribunal)).  "Such a 'quasi-exhaustion requirement,' finds no support in the plain language of the statute and runs counter to its express purposes, as 'it would undermine the policy of improving procedures for assistance to foreign and international tribunals by imposing an additional burdens on persons seeking assistance from our federal courts . . . .'"  *Id.* (quoting *Malev*, 964 F.2d at 100).

## III.   Excalibur Cannot Claim The Protection Of The Attorney-Client Privilege.

Excalibur's privilege claims fail because Excalibur has not established that any of the documents it withheld meet the most fundamental requirements of the attorney-client privilege.

The attorney-client privilege only protects confidential communications between an attorney and a client made for the purpose of providing legal advice. *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011). As the Second Circuit has articulated,

> (1) where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection be waived ….

*United States v. Bein*, 728 F.2d 107, 112 (2d Cir. 1984).[1] But since evidentiary privileges "stand[] in derogation of the public's 'right to every man's evidence, . . .[they] ought to be strictly confined within the narrowest possible limits consistent with the logic of [their] principle.'" *In re Horowitz*, 482 F.2d 72, 81 (2d Cir. 1973), *cert. denied*, 414 U.S. 867 (1973) (citation omitted).

The burden of establishing the privilege lies with the party asserting it. *Id.* at 81-82. This includes the burden of proving that a communication was made in confidence and that the privilege has not been waived. *Id.*; *Robbins & Myers, Inc. v. J.M. Huber Corp.*, 274 F.R.D. 63, 83 (W.D.N.Y. 2011).

"[D]isclosure to a third party by the party of a communication with his attorney eliminates whatever privilege the communication may have originally possessed…." *In re Horowitz*, 482 F.2d at 81; *see also Ratliff v. Davis Polk & Wardwell*, 354 F.3d 165 (2d Cir. 2003). It also waives the privilege as to all other communications related to the same subject matter, "in order to avoid prejudice to the adversary party and 'distortion of the judicial process' that may

---

[1] Federal privilege law applies to applications under Section 1782. *See In re Federation Internationale de Basketball*, 117 F. Supp. 2d 403, 407 (S.D.N.Y. 2000).

result from selective disclosure." *Robbins & Myers, Inc.*, 274 F.R.D. at 94 (quoting *In re von Bulow*, 828 F.2d 94, 101 (2d Cir. 1987)).

          A.      <u>Excalibur Has Not Established That Eric Wempen Was Acting As Its Attorney.</u>

A party claiming the attorney-client privilege must prove that the communication contains legal advice from a lawyer, acting as such, to his client. *Bein*, 728 F.2d at 112; *see also Pritchard v. County of Erie*, 473 F.3d 413, 421 n.9 (2d Cir. 2007) ("[A] lawyer not acting in her capacity as a lawyer is not a lawyer for the purpose of the attorney-client privilege."). Excalibur has not shown that Eric was acting as its legal counsel. There is, for example, no retention agreement or other documentary evidence showing that Excalibur retained Eric as its lawyer. Many e-mails between Eric Wempen and Rex Wempen were not designated as attorney-client communications or attorney work product, which undermines Excalibur's claim that Eric was acting as Excalibur's counsel.

Eric may well have given strategic advice to his brother, Rex, and he may even have given him advice about legal matters. Lots of attorneys give free legal advice to friends and family members. But that does not make Eric Excalibur's lawyer for privilege purposes, particularly when he glaringly omitted that detail from his witness statement,[2] he was employed full-time as a lawyer for UBS, and Excalibur has disclosed the bulk of his communications with Rex. There is simply no basis on which to conclude from the record facts that Eric was functioning as Excalibur's lawyer. Discussions between two alleged principals in a company are

---

[2] Eric Wempen submitted a sworn witness statement to the English court, which Excalibur's counsel e-mailed to and relied on in its pre-Motion communications with Texas Keystone's counsel in this matter. *See* Ex. E (Eric Wempen witness statement); Ex. H (communication between counsel).

not privileged because one of them happens to hold a law license (albeit in a state far removed from these events).

Moreover, during the relevant time period, Eric was employed by UBS as a tax lawyer, not by Excalibur as a business or litigation lawyer.  Excalibur even sought to enter into a financing agreement with UBS and negotiated (with Eric's involvement) with UBS on multiple occasions to try to secure financing for Excalibur's alleged share in the Kurdish concessions.  Under these circumstances, the ethical rules governing the legal profession prohibit Eric from acting as Excalibur's counsel.  *See* Cal. Rules Prof. Conduct 3-310.[3]  Furthermore, Texas Keystone has reason to believe that for Eric to provide legal advice to Excalibur while employed by UBS full-time as in-house counsel would have been entirely inconsistent with the terms of his UBS employment and UBS's internal policies.[4]

Not only this, but in the UK Litigation, Eric Wempen submitted a sworn witness statement; not once in that statement does he aver that he was acting as Excalibur's counsel.  Rather, he merely states that he is a "founder" and minority owner of Excalibur.  He has never appeared as counsel in any proceeding on behalf of Excalibur, nor is he listed as Excalibur's counsel in any correspondence.

Perhaps this is why, in a recent letter from Excalibur's counsel to Texas Keystone's counsel,  Excalibur's counsel, Clifford Chance, conceded that Excalibur did not assert any privilege or protection over communications between Rex and Eric Wempen, at least as to those

---

[3] Eric Wempen is admitted to practice law in California and therefore subject, at least, to California's Rules of Professional Conduct.

[4] *See* Code of Business Conduct and Ethics of UBS at 6, *available at* http://www.ubs.com/global/en/about_ubs/corporate_covernance/business_conduct.html (last accessed June 19, 2012).

communications that transpired between October 1, 2007 and November 6, 2007.  *See* Ex. D (June 15, 2012 Letter from Clifford Chance) at 11.

These facts lead inextricably to one conclusion:  Eric was not acting as Excalibur's lawyer, and, therefore, communications between Eric and Rex are not privileged.  *Bein*, 728 F.2d at 112; *Pritchard*, 473 F.3d at 421 n.9.  Excalibur's inconsistencies in withholding some communications between Eric and Rex while disclosing others demonstrate that Excalibur does not view Eric as Excalibur's lawyer.  And, as discussed more fully below, this selective disclosure effects waiver of any privilege that might have applied.

     B.    <u>Even If Eric Wempen Was Acting As Excalibur's Attorney, There Is Subject-Matter Waiver Through Selective Production.</u>

To the extent that Excalibur now asserts that Eric was acting as legal counsel to Excalibur—an assertion belied by the facts and record evidence—it has waived the attorney-client privilege through subject-matter waiver, which is properly found "where voluntary disclosure of confidential client-attorney communications 'involve[s] material issues raised by a client's assertions during the course of a judicial proceeding.'"  *Robbins & Myers, Inc.*, 274 F.R.D. at 94 (citing cases).

     (a)    **Selective Disclosure In This Proceeding**

Excalibur has elected, in this proceeding, to allow UBS to produce communications between Rex and Eric that appear to reflect litigation strategy and/or legal advice, yet it has selectively asserted privilege over others.  *See* Ex. B (providing non-exhaustive examples of disclosed communications between Eric and Rex).  For instance, in the documents UBS has produced, Rex requests Eric's comments on draft letters and legal agreements.  *See, e.g., id.* (ubs-ag00000489, 792, 834, 987).  Eric opines on the meaning of contracts between Excalibur and Texas Keystone.  *See, e.g., id.* (ubs-ag00001275, 1295, 1370).  And the brothers discuss

potential litigation against Texas Keystone and settlement strategy.  *See, e.g., id.* (ubs-ag00001305, 1403, 1830, 2181).  To provide just a few concrete examples:

- In an e-mail thread from early November 2007, Rex Wempen e-mailed Eric to tell Eric that Texas Keystone had signed a production sharing contract, but that Excalibur was not named in the contract.  *See id.* (ubs-ag00000857).  Eric responded that, "as [Rex's] consigliare [sic]," he recommended that Rex "make sure that the terms of [his] relationship with [Texas Keystone] are committed to writing," including "the dilution and resulting amendment of [Rex's] original agreement if necessary."  *See id.* (ubs-ag00000856).  Eric advised Rex that that not only would this impress Texas Keystone, it would also give Rex "leverage should [he] ever need to hint at legal action (or God forbid, bring a lawsuit")."  *Id.*  Rex responded by drafting an e-mail to Texas Keystone implementing Eric's advice.  *See id.* (ubs-ag00000855).  Before sending the e-mail to Texas Keystone, Rex sent it to Eric for his review and comments, which Eric provided.  *See id.*

- During the time Excalibur sought funding, Texas Keystone and Gulf asked Excalibur to sign a non-disclosure agreement ("NDA") that would protect confidential information related to the transaction.  Eric reviewed the NDA and advised Rex not to sign it.  *See id.* (ubs-ag00001731).  He advised Rex to "send [Texas Keystone] a short email saying … that you have spoken with your own outside counsel [*i.e.*, Eric] … and in his opinion, [Gulf] doesn't seem to be negotiating in good faith, so you are being advised not to execute a contract that is clearly prejudicial to your po[s]ition with no other written documentation in place…."  *Id.*  Rex responded by sending Eric a draft e-mail to Texas Keystone for Eric's review.  *Id.*  Eric reviewed the e-mail and edited it, including drafting a long section discussing changes that Texas Keystone would propose to the terms of the NDA.  *Id.* (ubs-ag00001729-30).  In his draft changes, Eric opined, among other things, that some of the NDA's original language was "either overly broad or prejudicial to Excalibur."  *Id.* (ubs-ag00001730).  He also wrote that the changes had been drafted by Excalibur's own "outside counsel"; there is no evidence that this was anyone but Eric.  *See id.*

- In early December 2007, after Excalibur had contacted outside counsel for advice on the transaction and possible litigation, Rex Wempen traveled to London to seek to negotiate with Texas Keystone.  *See id.* (ubs-ag00002226-28).  Possibly at the advice of his brother, *cf. id.* (ubs-ag00001834), Rex drafted a detailed "Memorandum for Record" to Excalibur's files recounting each of the interactions he purportedly had with Texas Keystone and Gulf while in London.  *See id.* (ubs-ag00002226-28).  Rex sent this memorandum to Eric for Eric's review.  *See id.* (ubs-ag00002229).  Eric commented that "the facts look fine," that he had "corrected a couple of typos," and that he "[had] no other issues" with the memo.  *Id.*  Eric then advised Rex to "save [the memo] to [Rex's] hard drive and then send to counsel…."  *Id.*

These examples are just a few among many.  Excalibur cannot pick and choose when to disclose Eric's advice and when to withhold it.  *Robbins & Myers, Inc.*, 274 F.R.D. at 94.  In fairness, Excalibur's voluntary, selective disclosure of Eric Wempen's opinions and advice require the disclosure of it all.

(b)      **Selective Disclosure In The UK Litigation**

In its production in the UK Litigation, Excalibur has also produced or otherwise divulged communications between Rex Wempen and Eric Wempen touching upon virtually every live legal and factual issue in this lawsuit.  Indeed, many of the documents that Excalibur disclosed in the UK Litigation could be described with the exact descriptions Excalibur has employed in its effort to protect the UBS documents from disclosure here.  For example, in the UK Litigation, Excalibur produced communications between Eric and Rex in which the brothers discuss:

- Excalibur's potential legal claim against Gulf Keystone;

- The merits of proposed counsel to advise on claims against Gulf Keystone;

- Information and instructions to be provided to external counsel in connection with litigation against Gulf Keystone;

- Litigation strategy for proposed litigation against Gulf Keystone;

- Conversations with external litigators; and

- The possible settlement of claims.[5]

Added to this, Exalibur has called Eric Wempen as a witness in the UK Litigation.  In the witness statement that he submitted to the English court, Eric provides his opinion on the terms of the various contracts, the merits of the parties' claims, and the facts of the underlying transactions.  *See* Ex. E (Eric Wempen witness statement). This affirmative use of Eric's

---

[5] If the Court requires it then these voluminous documents could be made available for its review.

testimony on a wide range of legal and factual issues waives whatever privilege Excalibur may

have had to protect Eric's less favorable opinions from disclosure.

Its name notwithstanding, Excalibur cannot wield the privilege as both a sword and a

shield. *United States v. Doe (In re Grand Jury Proceedings)*, 219 F.3d 175, 182 (2d Cir. 2000).

Excalibur's extensive affirmative use of confidential communications between Rex and Eric in

the UK Litigation, as well as its selective disclosure in this case, vitiate any claim it may have

had that the withheld documents are privileged. *Robbins & Myers, Inc.*, 274 F.R.D. at 94.

C.      Documents On UBS's Server Cannot Be Privileged.

Each of the purportedly privileged documents on the Excalibur privilege log is in the

possession, custody, and control of a third party, UBS.  Each document was sent or received

through UBS's e-mail system and is presently housed on UBS's server, where the documents are

"indiscriminately mingled with the other routine documents of the corporation," and where "no

special effort to preserve them in segregated files with special protections was made." *In re*

*Horowitz*, 482 F.2d at 81-82 (citation omitted).

Under such circumstances, no privilege applies.  Courts routinely hold that using an

employer's e-mail system to send and receive allegedly confidential communications eliminates

any privilege that may have attached, because an employee has no reasonable expectation of

privacy in those communications. *See, e.g., In re Reserve Fund Securities & Derivative*

*Litigation*, 275 F.R.D. 154, 159-60 (S.D.N.Y. 2011); *Long v. Marubeni Am. Corp.*, No. 05 Civ.

639, 2006 U.S. Dist. LEXIS 76594, at *7-9 (S.D.N.Y. Oct. 19, 2006); *Goldstein v. Colborne*

*Acquisition Co., LLC*, No. 10 C 6861, 2012 U.S. Dist. LEXIS 75743, at *12-15 (N.D. Ill. June 1,

2012).  "There can [be] no confidential communication where the [parties] are on actual or

constructive notice that their communications may be overheard, read, or otherwise monitored by

third parties." *In re Reserve Fund*, 275 F.R.D. at 159 (quoting *United States v. Etkin*, No. 07-

CR-913, 2008 U.S. Dist. LEXIS 12834, at *3 n.5 (S.D.N.Y. Feb. 19, 2008)).  The same is true, as Judge Friendly held in *In re Horowitz*, where a client knowingly leaves its purportedly privileged communications in a place where a third party has access to them.  *In re Horowitz*, 482 F.2d at 81-82; *see also Hardy v. New York News Inc.*, 114 F.R.D. 633, 644 (S.D.N.Y. 1987) (finding no privilege where company's attorney-client communications were intermingled with other company records and not marked as "confidential" or "privileged").

There was no expectation for privacy in any e-mail sent through Eric Wempen's UBS e-mail address.  UBS has access to each of the purportedly confidential e-mails that Excalibur has withheld.  Indeed, Excalibur itself has admitted that it does not have custody or control of any of the documents on the UBS server.  *See* Ex. C (March 8, 2008 Letter from Clifford Chance). And, neither Eric nor Excalibur ever took any efforts to maintain the documents as confidential, whether by designating them as "privileged," placing them in a special location, or taking action to recover them from UBS.

If this weren't enough, UBS's policy on "Email, the Internet and Other Electronic and Telephonic Communications" leaves no room for doubt on this point.  The UBS policy states, in the most pellucid of terms, that anything sent or received through UBS's e-mail system (1) becomes the property of UBS; (2) is "not private"; (3) is subject to review and monitoring; and (4) is disclosable in legal and regulatory proceedings:

> ***Anything that you transmit, receive or store in UBS communication systems, even if it is personal, nonbusiness related, and password-protected, is the property of UBS.***
>
> …
>
> ***[Y]our personal use of the UBS communication systems, including all personal email and chat (whether password-protected or not) is not private and may be monitored by UBS.*** All use of the UBS communication systems, including personal email and chat, is the sole property of UBS that may be stored and

archived by UBS and may be accessed and retrieved by UBS in
accordance with internal policies, procedures and controls.

…

**_All email and other electronic and telephonic communications
are subject to supervisory review and monitoring._**  UBS may
forensically retrieve and monitor all email sent from or received
using UBS communication systems (including any personal,
internet based email accounts, whether password protected or not).

**_UBS has the right, at any time and without notice, to access,
monitor, copy and/or disclose email_** and chat, as well as any other
information that is processed, stored, or transmitted using the UBS
communication systems **_regardless of whether the information is
considered business-related or personal._**

…

**_You should assume that all use of the UBS communication
systems may be disclosable in legal or regulatory proceedings._**
This applies even if the communication is not related to the
business of UBS, is personal, is password-protected, and/or has
been deleted by the user.

Ex. F at 1-2 (emphasis added).

In the presence of e-mail usage policies like this one, a communication exchanged

through an employer's server is not confidential and falls outside the scope of the attorney-client

privilege.  *In re Reserve Fund*, 275 F.R.D. at 159-65; *Long*, 2006 U.S. Dist. LEXIS 76594, at *7-

12 ; *Goldstein*, 2012 U.S. Dist. LEXIS 75743, at *12-15.  This is particularly true in this case,

where Excalibur left all of these documents on the UBS server for *five years* after this dispute

arose, including during the *18 months* since the litigation was filed.  Not only does this reflect

that Eric Wempen and Excalibur lack control over the documents (as they have admitted) and do

not have the right to access them, it also shows that Excalibur has not taken any steps to preserve

its allegedly confidential documents from possession of or disclosure to a third party, thereby

waiving the privilege.  *See In re Reserve Fund*, 275 F.R.D. at 163.

**IV.     Excalibur Has Waived The Protections Of The Work Product Doctrine.**

Excalibur's claim that the work product doctrine protects the withheld communications also fails due to waiver.  The attorney work product doctrine "provides qualified protection for materials prepared by or at the behest of counsel in anticipation of litigation or for trial."  *In re Grand Jury Subpoenas Dated Mar. 19, 2002 & Aug. 2, 2002*, 318 F.3d 379, 383 (2d Cir. 2003). To be protected by the work product doctrine, "the material must (1) be a document or a tangible thing, (2) that was prepared in anticipation of litigation, and (3) was prepared by or for a party, or by or for his representative."  *Lagace v. New England Central R.R.*, No. 3:06CV1317(RNC), 2007 WL 2889465, at *2 (D. Conn. Sept. 28, 2007); *FDIC v. Wachovia Ins. Servs., Inc.*, 241 F.R.D. 104, 106 (D. Conn. 2007).

The party invoking the protections of the work product doctrine bears the heavy burden of establishing its applicability.  *In re Grand Jury Subpoenas*, 318 F.3d at 384.  The burden is a heavy one, because privileges are neither "lightly created nor expansively construed."  *United States v. Nixon*, 418 U.S. 683, 710 (1974).

As with the attorney-client privilege, the work product protection can be waived.  "[A] party cannot partially disclose [protected] communications or affirmatively rely on [protected] communications to support its claim or defense and then shield the underlying communications from scrutiny by the opposing party."  *U.S. v. Doe*, 219 F.3d 175, 182 (2d Cir. 2000); *see also Salomon Bros. Treasury Litig. v. Steinhardt Partners, L.P.*, 9 F.3d 230, 235 (2d Cir. 1993) (stating that when "a party allows an adversary to share the otherwise privileged thought processes of counsel, the need for the privilege disappears" and that "[c]ourts therefore accept the waiver doctrine as a limitation on work product protection").  This waiver extends not only to the disclosed communication, but also to all other communications encompassing the same subject matter, which discourages selective disclosure and ensures fairness to litigants.  *See Bank*

*of America, N.A. v. Terra Nova Ins. Co.*, 212 F.R.D. 166, 174-75 (S.D.N.Y. 2002); *BristolMyers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*, No. 95 Civ. 8833(RPP), 1997 WL 801454, at *1 (S.D.N.Y. Dec. 31, 1997).

In this case, Excalibur has created for itself a massive selective disclosure problem.  As discussed above, Excalibur has picked and chosen among documents it has allowed to be disclosed in this action and the UK Litigation, asserting privilege and work product claims over some but not others.  Eric Wempen has also held himself out as a witness, offering a 36-page witness statement on a broad range of subjects, including the merits of the parties' factual and legal claims.  *See* Ex. E (Eric Wempen witness statement).  Under these circumstances, and out of fairness to Texas Keystone, this Court should not sustain Excalibur's selective, strategic assertions of the work product doctrine and should compel disclosure of the withheld documents. *Bank of America*, 212 F.R.D. at 174-75 (ordering disclosure based on subject-matter waiver because that result was "only fair" result for counterparty).  This is precisely the type of cherry-picking the selective waiver rule is designed to prevent.

## V. Excalibur's Privilege Log Does Not Substantiate Its Privilege Claims.

Excalibur has submitted a bare-bones and conclusory privilege log that fails to adequately support its privilege and work product claims.  In order to be adequate, a privilege log must "specifically identif[y] and describe[]" each withheld document, both so that the opposing party can make an intelligent legal response and so that "the court [has] an adequate basis on which to rule on the issue of discovery."  *Mid-Continent Cas. Co. v. Eland Energy, Inc.*, No. 3: 7 MC 78 (CFD), 2007 WL 948154, at *1 (D. Conn. Mar. 26, 2007); *see also Bolorin v. Borrino*, 248 F.R.D. 93, 95 (D. Conn. 2008) (stating that parties must provide enough "substantive detail for a meaningful review").  This detail must include, at the very least, the type of document, its subject matter, its date, its author, and each of its recipients. D. Conn. L. Civ. R. 26(e)(5).  "[I]f the

party invoking the privilege does not provide sufficient detail to demonstrate fulfillment of all

the legal requirements for application of the privilege, his claim will be rejected." *Horace Mann*

*Ins. Co. v. Nationwide Mut. Ins. Co.*, 240 F.R.D. 44, 47 (D. Conn. 2007) (quoting *United States v.*

*Constr. Prod. Research*, 73 F.3d 464, 473 (2d Cir. 1996) (internal citation omitted)).

Excalibur's privilege log falls far short of this standard.  Its document descriptions are

repetitive and rote, in almost every case providing no basis for concluding that communications

in fact convey privileged information or constitute litigation work product.  By way of example,

Excalibur's terse document descriptions include: "Forwarding email from external litigator,"

(ubs-ag00002956); "Discussing email from external counsel" (ubs-ag00002986); and

"Discussion of settlement" (ubs-ag00002395).  *See* Ex. A (Excalibur Priv. Log).  None of these

descriptions shows that Excalibur was either seeking or receiving legal advice in the subject

communications.  Scores of times, Excalibur repeats, verbatim, identical document descriptions.[6]

A number of the log's entries do not indicate the author or the recipient.  *See, e.g., id.* (ubs-

ag00003221-3235).  Others do not contain a date.  *See, e.g., id.* (ubs-ag00002264, 3150, 3221-

3235).  Still others are obviously missing information about parties who were cc'd or who

otherwise received the communication, as evidenced by the fact that each document on the

privilege log was, at some point, received by Eric Wempen at his UBS e-mail address, yet Eric is

not listed in several of the log entries.  *See, e.g., id.* (ubs-ag00002209, 2215, 2396).  This

naturally gives rise to the question of whether Excalibur has omitted information about other

document recipients.  Excalibur has created a privilege log that appears to be purposefully non-

---

[6] *See* Ex. A (Excalibur Priv. Log) ("Discussion of instructions to external litigator" or "Discussing instructions to external litigator": 24 entries; "Draft settlement documents attached to above email": 41 entries; "Email discussing potential legal claim against Gulf Keystone": 18 entries).

descriptive and has cut a wide and inappropriate swath with its privilege claims.  This Court should compel the production of the withheld documents.

### VI.    English Law Does Not Protect The UBS Documents From Disclosure.

In what appears to reflect a tacit recognition that no U.S. privilege or protection shields the withheld communications from disclosure, Excalibur seeks to justify its improper withholding of documents under "the rules of privilege applied by the Courts of England and Wales."  Ex. A (Excalibur Priv. Log) at 1.[7]  But, Excalibur has failed to meet its burden of establishing that English law protects the documents from discovery under 28 U.S.C. § 1782.

A party claiming that a document is exempt from discovery under Section 1782 on the basis of foreign law bears a particularly weighty burden.  *See Metallgesellschaft v. Hodapp*, 121 F.3d 77, 80 (2d Cir. 1997).  It must show by "authoritative proof" not only that the privilege it asserts exists under foreign law and would protect the document from discovery, but also that "a foreign tribunal would reject the evidence" if it were presented to the foreign tribunal.  *Id.* (quoting *Euromepa, S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1100 (2d Cir. 1995)).  Absent "authoritative proof," requiring a district court to determine the scope of foreign privilege law "would involve it in a 'speculative foray[] into legal territories unfamiliar to federal judges,'" resulting in "'an unduly expensive and time-consuming fight about foreign law,'" *id.* (internal citations omitted).  It would also fail to promote the twin aims of Section 1782, which are to "'provid[e] efficient means of assistance to participants in international litigation in our federal

---

[7] Though it claims to be asserting English privileges, neither of the two privileges Excalibur claims in its privilege log ("Litigation Work Product" and "Attorney-Client") is recognized under English law.  Excalibur's assertion that English law governs privilege issues is belied by its own citation to U.S. privileges—not English privileges—as the basis of its privilege claims.

courts and encourage[e] foreign countries by example to provide similar means of assistance to

our courts.'"  *Id.* (quoting *Malev*, 964 F.2d at 100).

A.  Excalibur Has Failed To Establish By Authoritative Proof That English
Law Protects The Documents.

It is far from clear that English law provides any protection for the documents Excalibur

has withheld under the circumstances of this case.  Because Excalibur has not established by

authoritative proof that any English privilege extends to the documents it has withheld, English

law cannot apply.  *Metallgesellschaft*, 121 F.3d at 80; *see also In re Houck*, No. 3:96 MC 419

EBB, 1997 WL 1052017, at *3 (D. Conn. Oct. 10, 1997) (rejecting claim of privilege under

Swedish law, where party refusing to comply with discovery order failed to establish privilege

by "authoritative proof").

As discussed in Part III.B above, Excalibur has claimed privilege over numerous

documents that it may have already disclosed.  Although Texas Keystone obviously has not seen

the documents listed in Excalibur's privilege log, certain document descriptions and dates in

Excalibur's privilege log correspond precisely with the dates and contents of documents that

Excalibur has already produced in the English proceedings.  Excalibur cannot, therefore,

establish that these documents are confidential, which is a fundamental requirement for privilege

to apply under English law.  *Attorney-General v Guardian Newspapers Ltd* (No 2) [1990] 1 AC

109, 282 (Lord Goff).[8]

And, like U.S. law, English law recognizes subject matter waiver of privilege, called

"collateral waiver."  *Fulham Leisure Holdings Ltd v Nicholson Graham Jones* [2–0] EWHC 158

(CH).  As with subject matter waiver, collateral waiver applies when a party has selectively

---

[8] Texas Keystone has submitted a courtesy copy of the English cases cited in this brief,
which are attached as Exhibit I.

disclosed certain documents while seeking to withhold other documents concerning the same "transaction" (*i.e.* documents on the same topic) on the basis of privilege. *Dunlop Slazenger International Ltd v Joe Bloggs Sports Ltd* [2003] EWCA Civ 901. The rationale is one of fairness, to ensure that a litigant cannot cherry-pick privileged documents which most support his case and claim privilege in relation to less favorable ones.

As discussed above, in the course of the English proceedings and in this action, Excalibur has disclosed communications between Excalibur and Eric Wempen on almost every topic relevant to the UK Litigation. Neither US nor English law permits Excalibur now to selectively withhold other communications on those same topics.

B.    <u>Excalibur Has Failed To Establish By Authoritative Proof That An English Court Would Reject The Evidence.</u>

To withhold documents based on the alleged protections of English privileges, Excalibur would also have to show by "authoritative proof" that the English court would reject the evidence that Texas Keystone seeks. *Metallgesellschaft*, 121 F.3d at 80; *In re Esses*, 101 F.3d 873, 876-77 (2d Cir. 1996). Excalibur has presented no such evidence. On the contrary, English courts are traditionally receptive to Section 1782 discovery. *See In re Philips,* No. M 19-96, 2004 U.S. Dist. LEXIS 16426, at *6 (S.D.N.Y. Aug. 18, 2004) (rejecting the notion that "the government of the United Kingdom would disfavor ... relief under Section 1782"). As the United States Supreme Court has acknowledged, the English House of Lords (at the time the highest court in England) held that even "nondiscoverability under English law [does] not stand in the way of a litigant in English proceedings seeking assistance in the United States under Section 1782." *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 261 (2004) (citing *South Carolina Ins. Co. v. Assurantie Maatschappij "De Zeven Provincien" N. V.* [1987] 1 A.C. 24 (B.L.) (appeal taken from Eng.)). *See also Nokia Corp. v. InterDigital Tech. Corp.*, [2004]

19

EWHC 2920 (Pat).  Excalibur cannot, therefore, claim that any English privilege applies in this 1782 action, and this Court should order Excalibur to produce the improperly withheld documents.  *See Metallgesellschaft*, 121 F.3d at 80; *In re Esses*, 101 F.3d at 876-77.

## **CONCLUSION**

The attorney-client privilege and the work product doctrine promote an important social end, namely ensuring that confidential communications can take place between counsel and client, and allowing parties to prepare for litigation.  But, when there is no attorney-client relationship, there is no privilege.  When there is no reasonable expectation of confidentiality, protections cease to apply.  And when a litigant tries to use the protections of privilege law as both a sword and a shield, or selectively discloses some communications between it and its alleged attorney, its privilege claims cannot be sustained.

Excalibur's privilege and work product claims fail on all fronts.  It has left its documents on a UBS server for five years with no reasonable expectation of confidentiality and without taking any efforts to secure the documents.  It has selectively disclosed documents, withholding others on the same subject matter.  And it has affirmatively used documents and communications between Eric and Rex in the UK Litigation.  Finally, there is no proof that Eric Wempen was Excalibur's lawyer; any such assertion is not supported or supportable.  This Court should compel the disclosure of the UBS documents that have been withheld.

Dated: June 21, 2012                    Respectfully submitted,


                                        */s/  Peter D. Laun*
                                        Ann H. Rubin
                                        Federal Bar No. ct04486
                                        Carmody & Torrance LLP
                                        50 Leavenworth Street
                                        P.O. Box 1110
                                        Waterbury, CT 06721-1110
                                        Telephone: (203) 573-1200
                                        Facsimile: (203) 575-2600
                                        Email: arubin@carmodylaw.com

                                        Peter D. Laun
                                        Federal Bar No. phv05384
                                        Jones Day
                                        500 Grant Street, Suite 4500
                                        Pittsburgh, PA  15219-2514
                                        Telephone:  412-391-3939
                                        Facsimile:   412-394-7959
                                        Email:  pdlaun@jonesday.com

                                        **Attorneys for Texas Keystone, Inc.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 21, 2012, a copy of the foregoing Brief in Support of Texas

Keystone Inc.'s Motion to Compel Production of Documents was filed electronically and served

by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail

to all parties by operation of the Court's electronic filing system or by mail to anyone unable to

accept electronic filing, as indicated on the Notice of Electronic Filing.  Parties may access this

filing through the Court's CM/ECF system.


 _/s/  Peter D. Laun_____
Attorney for Texas Keystone, Inc.