**In re:  the Application of: TEXAS KEYSTONE INC.**
**Case No. 3-12-mc-00041-MRK**


**BRIEF IN SUPPORT OF TEXAS KEYSTONE INC.'S**
**MOTION TO COMPEL PRODUCTION**

# EXHIBIT E

On behalf of: Claimant
Witness: E.P.Wempen
Statement: First
Dated:  13 April 2012

**IN THE HIGH COURT OF JUSTICE**

**QUEEN'S BENCH DIVISION**

**COMMERCIAL COURT**

**Claim No. 2010 Folio 1517**

**B E T W E E N:**

**EXCALIBUR VENTURES LLC**

**Claimant**

**- and –**

**(1) TEXAS KEYSTONE INC.**
**(2) GULF KEYSTONE PETROLEUM LIMITED**
**(3) GULF KEYSTONE PETROLEUM INTERNATIONAL LIMITED**
**(4) GULF KEYSTONE PETROLEUM (UK) LIMITED**

**Defendants**

---

**FIRST WITNESS STATEMENT OF**

**ERIC PUTNAM WEMPEN**

---

**I, ERIC PUTNAM WEMPEN of 137 Old Long Ridge Road, Stamford, Connecticut 06903, USA will say as follows:**

1. **INTRODUCTION**

1.1 I am a corporate, transactional, and tax attorney specializing in investment banking, complex financial transactions and derivatives, and cross-border mergers & acquisitions. I am currently an Executive Director with UBS AG, a multinational investment bank headquartered in Zurich, at its US headquarters in Stamford, Connecticut where I serve as Equities Counsel and Head of Capital Markets Tax. As part of UBS' tax function, I am currently responsible for all trades and transactional activity in North and South America.

1.2 Together with my older brother, Rex Wempen I am one of the founders of the Claimant, Excalibur Ventures LLC ("**Excalibur**"), a Delaware limited liability company. I hold a minority interest and my brother holds the majority interest.

1.3 For ease of reference, in this witness statement I refer to the 1st Defendant as "**Texas Keystone**" and the 2nd to 4th Defendants collectively as the "**Gulf Keystone Defendants**", unless there is a reason to distinguish between them in which case I refer to the 2nd to 4th Defendants respectively as "**Gulf Keystone**", "**Gulf Keystone International**" and "**Gulf Keystone UK**".

1.4 There is now produced and shown to me and marked "**EPW1**" a paginated bundle of documents to which I make reference in this statement. References to page numbers in this statement are to pages of "**EPW1**" unless the contrary is indicated.

2. **MY BACKGROUND AND EXPERIENCE**

2.1 I obtained my undergraduate degree, a Bachelor of Arts in Economics, from the University of California at Los Angeles (UCLA) in 1991, my law degree (JD) from George Mason University Law School in 1997, and a Master of Laws (LLM) in Taxation from the Georgetown University Law Center in 1998. I was admitted to the State Bar of California in 1997 and I have held a California Bar practice certificate ever since.

2.2     After obtaining my undergraduate degree, I initially worked in the Directorate of Operations of the Central Intelligence Agency, followed by a brief stint in the private sector working in the transportation and freight forwarding industry.

2.3     Before attending law school, in January 1994, I obtained my commission as an officer in the US Army where I served as a Reservist for 11 years, serving in and commanding numerous infantry and intelligence units and ultimately reaching the rank of Captain. During that time, I served for two years as a counterintelligence officer with US Special Operations Command and for five years with the Human Intelligence (HuMint) division of the Defense Intelligence Agency where I held one of the highest Top Secret security clearances in the US military and both worked in and commanded a joint operational unit.

2.4     During 1997 and 1998, while obtaining my Master of Laws degree in Taxation, I worked nearly full-time in the General Counsel's Office of the Export-Import Bank of the US as an intern preparing export financing agreements for US exporters and working on international project finance transactions in conjunction with the Overseas Private Investment Corporation ("**OPIC**"), the US government's development finance institution. During that period, I learned a great deal about the US Government's support of overseas projects through the use of loans, loan guarantees, and political risk insurance, and saw a number of projects through from start to finish, from supporting the sale of equipment by US exporters to purchasers in lesser-developed countries through loan guarantees, to providing political risk insurance to US-owned projects in emerging markets. With respect to this last segment of deals, I became familiar with the rules governing the minimum amount of US ownership required for project approval, often referred to as the "*US content*" or "*US ownership*" requirements. I also developed a strong contact base within this niche industry, including contacts in the Export-Import Bank, OPIC, and other international development banks such as the International Finance Corporation. These contacts spanned various divisions from individuals working on legislative affairs to the loan officers handling specific types of projects and those working on specific country desks.

2.5     My initial legal job, after finishing my Masters, was as a tax lawyer with KPMG LLP, where I spent 5 years specializing in international mergers and acquisitions ("**M&A**"),

and establishing foreign branch operations and offshore holding company structures for multinational corporations. I then spent the next three years working as a senior associate in the international and private banking groups of the international law firm Baker & McKenzie LLP. During this time, I structured and negotiated cross-border private equity investments and investment funds for investment banks, private banks, and major lending syndicates, developing a thorough understanding of different methods and structures commonly utilized to invest in offshore infrastructure projects, as well as the legal and commercial requirements necessary for a project to successfully navigate a thorough due diligence review. I also addressed money laundering and Foreign Corrupt Practices Act issues for financial institutions and corporate clients. Given my significant involvement in the private banking industry during this time, I developed a large base of international contacts within private banks, such as BNP Paribas, UBS, HSBC, and Royal bank of Canada, ultra high net worth families within the US and Latin America, and many of the legal and financial advisors serving the private banking industry.

2.6    In 2006, I moved to my current position at UBS, where I am involved in both the funding and marketing aspects of investment funds, as well as the structuring and negotiating of all private equity issuances for the firm, from infrastructure to energy funds. In addition, I also advise UBS-sponsored funds on M&A activity associated with cross-border fund investments.

2.7    With the benefit of my background, I was in a good position to assist my brother, Rex, when, as one of the very first (if not the first) Western businessmen on the ground in Kurdistan following the US invasion of Iraq, he decided to set up Excalibur.


3.    **THE FORMATION OF EXCALIBUR AND ITS INITIAL BUSINESS ACTIVITIES**

*The US invasion of Iraq; Rex travels to Kurdistan*

3.1    Prior to the US invasion of Iraq in 2003, Rex was living and working in the US. Through his military and business career, Rex had an extensive amount of experience working overseas in developing countries, from Asia and the Far East to the Middle East, in various roles, from purely commercial to diplomatic. Rex also had a

significant number of political contacts on Capitol Hill beginning from his time working for Congressmen Dana Rohrabacher (Republican) and Glen M. Anderson (Democrat), and through his experience working on national security projects in Washington DC. He also had a significant amount of experience and contacts in the diplomatic community due to his time working with the US State Department and his time in the US Embassy in New Delhi. Rex had attended the Georgetown University School of Foreign Service where he obtained his Masters in National Security Studies, before obtaining his MBA at the University of Southern California.  In early 2003, when the US government began setting its sights on regime change in Iraq, Rex was aware from colleagues, friends, and associates on Capitol Hill that significant resources would be needed and were going to be brought to bear in rebuilding Iraq after the regime change.

3.2     There was a longstanding friendship between the US and the Kurds, and it was well known in Washington DC that the Kurds were co-ordinating with the US during the run-up to the invasion and that the Kurds would likely represent the only organized government body post-regime change. Based on this background, Rex determined that the best place to start developing his business ties was in Iraqi Kurdistan, and through his political contacts in Washington DC, Rex made contact with representatives of the existing Kurdish governing authority and made plans to travel there.

3.3     Around the time that the US invasion began, Rex entered Iraq from the North and began developing relationships in Kurdistan that would last for a number of years. Both immediately prior to, and upon his initial entry into Iraq, I was in touch with Rex on a daily basis, handling a significant portion of the logistics (wire transfers, maps, etc.) and communications, as well as all of the legal documentation which was critical to ensure his safety and assist his movement at such a volatile time. This was no ordinary business trip. The situation was fluid and volatile, and there was no straightforward way to reach Kurdistan. Following the closure of the Turkey / Kurdistan border in early March 2003, even the US military was finding it difficult to reach Kurdistan. In early 2003 only US Special Forces (Rex's former unit) and CIA paramilitary units were in country, operating with the Kurdish resistance to the Saddam regime, the *Pesh Merga*.

3.4     Since Rex had nonetheless managed to enter Kurdistan and was there when Saddam fell, he was well placed to make the best of his 'first-mover' advantage.  Post-invasion, Rex moved from Kurdistan to Baghdad in order to be close to the inner workings of the US reconstruction efforts. Rex established an office in the Sheraton Hotel, Baghdad, one of the two hotels utilized by Westerners and through which nearly every US contractor or businessman eventually passed in the early stages after the initial US and allied occupation and the creation of the Coalition Provisional Authority (or "**CPA**").  Rex was therefore at the hub of activity from day one.

### The formation of Excalibur and its initial commercial activities

3.5     From the moment Rex began to establish himself in Iraq, I assisted him with legal and logistical matters. I spent a significant portion of my time liaising with the US State and Treasury Departments regarding the constantly-changing laws and regulations impacting the legal presence of US citizens in Iraq, exchanging official correspondence with them documenting Rex's compliance with these rules, and ensuring that Rex both complied with every change as it occurred and maintained documentation on his person supporting his legal presence.

EPW1/3

EPW1/17

EPW1/23

EPW1/27

3.6     I also assisted Rex with the legal formation of Excalibur in April 2003 as well as several additional legal entities Rex required for his local business activities going forward. At this juncture in time, my assistance began more heavily taking the form of straight legal support and advice on Excalibur's business ventures, in particular drafting and reviewing all legal agreements and associated documentation.  I drafted the initial batch of the many pro-forma agreements that Rex would utilize over the coming years for Excalibur's business ventures, including service agreements, non-disclosure and non-circumvention agreements, memoranda of understanding and joint venture agreements. Rex and I were still in almost daily touch by mobile phone, satellite phone and email, although connections were spotty at times, and while the situation on the ground was initially tense, we were able to make some significant headway, including getting Rex officially credentialed as a CPA contractor which provided him with access to a significant portion of the initial reconstruction efforts and high level involvement in the first reconstruction efforts in-country. As Excalibur's business grew, Rex employed an office manager and other support staff, as well as over 100 employees.

EPW1/1

3.7     As time continued, Excalibur's '*first-mover*' status began to bring success, and Rex began consulting for major US and non-US multinational companies that were interested in unlocking the Iraqi market in numerous industries, from telecommunications to furniture to oil and gas. Given Rex's CPA contractor status, Excalibur had access to valuable information and contacts regarding the regeneration efforts which were unavailable back in the US and the West in general. Through his contacts in the US and specifically in Washington DC, Excalibur received numerous requests for commercial assistance and consulting engagements from major US companies. Excalibur was soon engaged in a thriving consulting business, advising major public companies as well as non-Western infrastructure companies and private investment funds, under contract. In most cases, Excalibur would perform an assessment of the company's products and services, meeting with US and CPA officials and representatives, and at times with Iraqi officials, to determine the need for the company's products and services, and then assist the company with either sales pitches or proposals. Through all of the companies that Excalibur worked with, due to the work he was involved in and because he lived and worked in the hub of all business activity in Iraq, Rex knew or became acquainted with the top executives of many of the world's major infrastructure, construction, and energy companies. Through these relationships, Rex also developed a thorough understanding of how to develop business in Iraq.

3.8     In mid-2004, Rex established the Iraq branch of the US Chamber of Commerce ("**AmCham Iraq**") in order to further develop the business environment within Iraq for US companies and personally recruited the founding members of the branch from the largest US engineering, construction, infrastructure, and oilfield services companies, to include the Iraq Country Manager of Bechtel, who served as President of the branch from May 2004, as well as executives from Kellogg Brown & Root, and Fluor.

3.9     Given the time difference between the Middle East and the US, I often co-ordinated with Excalibur's clients in the US and Europe, both by telephone and in person, and assisted with negotiations, contract requirements, and proposals as needed. For example, Virco Manufacturing, Inc. engaged Excalibur and paid a six-figure annual consulting fee to Excalibur to assist it in attempting to open up the Iraqi market to the

EPW1/2

sale of its furniture to the schools being built and developed by the CPA. Given Rex's presence in Iraq, I traveled to Virco's headquarters in California, met with its President and senior executives, and toured its manufacturing facilities in order to more fully understand its business and products and to understand its management's goals within the Iraqi market which I then reported to Rex. In addition, I recall that QualComm, Inc., a major US telecommunications company, engaged Excalibur and paid a sizeable monthly retainer in order to assess the Iraqi market and attempt to source local contracts. Excalibur was also engaged as a consultant by Occidental Petroleum, an international oil and gas exploration and production company and the fourth largest based in the US

EPW1/24

3.10   Given the wide needs of the US and coalition militaries in Iraq at the time, Excalibur also entered into agreements with companies who wished to sell directly to these forces. I was often heavily involved with some of these projects. For example, Excalibur assisted a company which was seeking to sell x-ray machines for monitoring trucks and containers for explosives.

3.11   Given the trust placed in Excalibur by both private and governmental entities, Excalibur was always extremely wary of dealing with any company utilizing business methods or processes that did not comply with all applicable local and US legal and regulatory rules.

3.12   One of Excalibur's most successful projects was the National Economic Survey of Iraq ("**NESI**"), a contract entered into by Excalibur directly with the CPA and which gathered information about all of the primary industries within Iraq and their development. Excalibur employed over 100 people to collate all of the available information regarding the various sectors within the Iraqi economy, and produced detailed reports, graphs, and charts for government-level dissemination. Results from NESI were ultimately briefed at the highest levels of the US government, to include the White House and congressional hearings.

3.13   While its consulting business was growing, Excalibur began to set its sights on more lucrative development and infrastructure projects within Iraq. By pulling together local partners as well as local and foreign industry specialists, Excalibur was able to explore projects in several key industries, to include power generation and

downstream oil and gas projects. Once Excalibur had chosen several projects of interest, it began entering into Memoranda of Understanding ("**MOUs**") with a number of local and international companies, as well as major public companies, such as KBR, a subsidiary of Halliburton at such time, as potential joint venture parties to explore projects within certain industries including electricity and oil. After gathering a core group of industry specialists and engineers and setting the appropriate stage with the relevant ministries, Excalibur was then able to begin bidding on some of the major power generation and refinery projects in Iraq.  For example, in mid-2004, after working for a number of months with a consortium of engineers and power generation specialists, Excalibur submitted a several hundred page technical proposal for a 100MW gas turbine power facility in Iraq to the Iraqi Electricity Ministry, as well as others.

3.14   For this and many other projects, I assisted Rex with drafting the relevant MOU and similar documentation and, together with him, developed a draft Joint Venture <span style="float:right">EPW1/5</span> Agreement for existing and future discussions with potential partners. When legal counsel was required, such as for conference calls and discussions with KBR's general counsel, Rex would often involve me in conference calls with these companies.

3.15   In order to address the financing needs for these increasingly large projects, Rex and I came up with a unique model blending private equity with US development bank support.  Using this model, Excalibur formed the Iraq Recovery Fund ("**IRF**") as its primary funding vehicle with the stated purpose of raising funding for projects solely within the borders of Iraq. After assembling a management team consisting of US private equity and banking experts, as well as local and regional partners, Excalibur began exploring funding options.  As soon as the US government development banks began opening up to business in Iraq, Excalibur approached OPIC and entered into negotiations to support the IRF's initiatives. Given the unique political risks facing major development projects within Iraq, Excalibur realized early on that projects supported by OPIC had a much greater chance of success, and that the support of the US government would go a long way in making projects viable and attractive to outside investment. Given my experience with OPIC and with these deals in general, I

was heavily involved with advising Rex at each stage of this process, including discussions and negotiations with OPIC.

3.16   In June and July, 2004, Excalibur entered into a Commitment Letter and Framework Agreement, respectively, with OPIC to provide US government-sponsored political risk insurance to the IRF's projects, to the extent that they would remain in compliance with the relevant OPIC guidelines, not least of which were the US ownership requirements.   Specifically, OPIC agreed to cover both equity and debt investments in the IRF's portfolio investments. OPIC ultimately agreed to support up to US$2 billion of the fund's investments in oil exploration, production, or refinery capacity.

EPW1/28

EPW1/32

3.17   I have read paragraphs 4.1 to 4.13 of Rex's Witness Statement served in these proceedings and confirm that it reflects my understanding, at that time, of Excalibur's business activities and its OPIC backing.

*Excalibur in Kurdistan*

3.18   As the world's multinational engineering, construction, and major international oil companies became firmly entrenched in Iraq proper and the security situation worsened, the entrepreneurial opportunities to develop small to mid-size projects in the region decreased dramatically, and Excalibur found itself needing to re-focus its efforts in order to locate suitable projects for investment.

3.19   Contrary to the situation in Iraq, Kurdistan's security situation at this point was (and remains to this day) relatively stable and its political institutions were burgeoning. After being involved with bids for major infrastructure projects within Iraq with many substantial infrastructure companies for a couple of years, Rex was more than prepared to develop projects and conduct the activities he would ultimately engage in within Kurdistan. In December 2004, Excalibur entered into an MOU with a local partner, the Dabin Group ("**Dabin**"). It was essential for any foreign company attempting successfully to bring in foreign investment to team up with a local company run by one of the few major families with the appropriate knowledge of the economic and political landscape in Kurdistan. Dabin was such a company. Excalibur's MOU with Dabin was formalized through the execution of a Services Agreement in January, 2005, which I drafted.

EPW1/39

EPW1/41

3.20    One of the first major successes of Excalibur's relationship with Dabin was the positive dialogue it entered into with the Kurdistan Regional Government (the "**KRG**") and which resulted in a letter from the KRG Minister of State, Falah Bakir, EPW1/44 inviting Excalibur to bid for projects in several industries including oil exploration. I was aware that Rex visited Erbil in early 2005 and met with representatives of the precursor to the Oil Ministry, the OGE, including George Yacu. I understood that, through his discussions with the KRG, Rex considered that Excalibur had a good chance of successfully bidding for a petroleum block in Kurdistan.

3.21    I was aware, through conversations with Rex at this time, that Excalibur's initial plan was to obtain a concession directly on the strength of its OPIC funding and then subcontract the majority of technical Exploration & Production ("**E&P**") work to one of the major oil services companies, such as Halliburton, the parent company of KBR (which Excalibur had an existing agreement with) at such time. We were well aware that this is how oil concessions are often approached worldwide. Ultimately, however, George Yacu informed Rex that the KRG had decided it would be more comfortable working with consortiums that included actual E&P operators as consortium members, which meant that utilizing a major oil services company such as Halliburton was no longer an option. He therefore suggested to Rex that he should try to put together a consortium that would include an E&P company. We understood that the rationale for this requirement was that the KRG expected the concession agreements to come under scrutiny from the government in Baghdad, and so having an established E&P operator with international experience would help to justify any award. I recall Rex telling me that George Yacu was positive about the chances of Excalibur obtaining a petroleum block and had expressed a lot of interest in Excalibur's OPIC-backing (i.e. the fact that Excalibur had OPIC political risk insurance). OPIC insurance would strongly support the fund's underlying deals since it meant that any supported projects would be backed by the "*full faith and credit of the United States of America*," thereby increasing the fund's commercial attraction to investors. In addition, however, it also meant that the US would actively work to protect any deals, and therefore Kurdistan, from becoming subject to political risk in the first place, which would provide the KRG itself with an additional layer of protection at this early stage in its development. The political risk OPIC would be covering included civil strife, government coups, and other politically-motivated violence (including terrorism), and

more importantly, improper government interference from Iraq's central government in Baghdad in any projects, to include interference in any oil contracts, as well as potential incursions from outside forces.  George Yacu had even set a tentative date for Excalibur to bring its consortium, including its new operator, to Erbil to meet with OGE officials and the Prime Minister in order to finalize a concession.  The KRG was therefore well aware of Excalibur's presence as a consortium member, and there was never any discussion that Excalibur was not qualified to participate in a concession as a consortium member. At this point therefore Rex set about looking for a suitable E&P company to partner with Excalibur in this joint venture.

3.22   I have read paragraphs 5.1 to 5.9 of Rex's Witness Statement and confirm that it reflects my understanding, at that time, of how Excalibur came to pursue the oil opportunities in Kurdistan.

## 4.   NEGOTIATIONS WITH GULF KEYSTONE AND TEXAS KEYSTONE AND THE COLLABORATION AGREEMENT

*The search for a suitable E&P company*

4.1   I was aware that, during the summer and fall of 2005, Rex began approaching E&P companies in earnest. Given the US role in Kurdistan during the previous decade, the KRG had made it known to Rex, directly and indirectly through the Dabin Group, that it was seeking US companies and oil operators to lead and participate in bids. Accordingly, in searching for a suitable E&P operator, Rex's first choice was a US E&P operator. This was also an important criterion for OPIC backing pursuant to its US ownership requirements. I was also aware that Rex's first choice was one of the major US E&P companies such as Occidental which Excalibur had been acting for as a consultant in Baghdad.

4.2   The deal that Excalibur was proposing was effectively a 50:50 joint venture between Excalibur and the chosen E&P company.  Each participant, including Excalibur, would provide its own funding and would share in the costs of the project. In return for expertise in oil exploration and production, Excalibur was offering local country expertise, an influential local partner in Dabin, the benefit of Rex's extensive contacts and experience in the region and a written invitation from the KRG Minister of State

to invest in the region, as well as a specific invitation from the oil ministry to discuss the award of a concession in what was initially touted by the KRG as being an imminent bidding process. Excalibur also had the OPIC backing which Rex understood from his meetings in Erbil was viewed positively by senior members of the KRG given both the commercial and political support it would provide. Excalibur was not selling itself as an agent or a 'deal finder', but was looking for a partner to serve as the E&P operator.

4.3    We were always confident we would be able to obtain the necessary funding to support a 50% share in any joint venture, provided that we had sufficient documentation in place confirming our interest in, and rights to invest in, the concession, not least because obtaining funding for deals involving a sovereign power or government is generally much easier than deals involving only private companies given the level of credibility deriving from being part of such a deal, as well as the decreased due diligence required for such projects.

4.4    I recall that Rex travelled to a number of trade fairs around the world and held meetings with various oil companies, but that there was a certain amount of reluctance at that time to get involved in Kurdistan, whether due to concerns regarding Iraq and its security situation, or for many of the oil Majors who were already comfortable with and interested in Iraq, concerns around being blackballed by Baghdad for dealing with the KRG.

4.5    Around November 2005, Rex received interest from a US E&P company called Gaither Petroleum Corporation ("**Gaither Petroleum**") and that Rex was involved in arranging for the CEO of Gaither Petroleum to travel to Erbil to meet with the OGE. Unfortunately, Gaither Petroleum was unable to attend the meeting given demands from other existing projects, and Rex decided that he should continue looking again for a suitable E&P company.

*The draft Joint Venture Agreement*

4.6    I have a vague recollection of a short telephone call with Rex on December 22, 2005 requesting that I send a draft joint venture agreement to someone called Todd Kozel at a company called Gulf Keystone. The joint venture agreement was one of the standard agreements that I had developed for Excalibur's business ventures and it was by now

- 12 -

quite common for Rex to call me up and ask me to send one of these agreements to a contact that he had met. He asked me to complete the relevant contact details for Todd, who was described as the CEO of Gulf Keystone and to describe the counter party as "*Texas Keystone/Gulf Keystone Ltd a limited liability company organized and existing under the laws of the state of _____ of the United States of America and Bermuda, respectively (Keystone)*".

4.7     Once I had filled in the relevant details, I emailed the draft to Todd Kozel at his Gulf Keystone email address (which Rex had also given to me) also copying in Rex. I explained who I was and that Rex had asked me to forward the attached draft joint venture agreement between Excalibur and Gulf Keystone. I told Todd to "*feel free to make any proposed changes or alterations to the agreement*", and that we were happy to discuss any issues that he might have. Although Rex had told me to describe the counterparty as "*Texas Keystone/Gulf Keystone Limited*", I did not think anything of this at the time. As is apparent from my cover email, I understood that the draft joint venture was an agreement between Excalibur and Gulf Keystone. I did not at that time know what involvement Texas Keystone was to have.

4.8     I do not recall receiving any email response from Todd but I was aware that Rex subsequently followed up with him regarding the draft.

4.9     I should mention that I sent this email to Todd from my Baker & McKenzie email account. I am aware that a copy of email has been disclosed in these proceedings by the Defendants taken from Todd's email account (that is why the time at the top of the email is the time in the UK that the email was received not the time that it was sent by me) but that the equivalent email from my Baker & McKenzie email account has not been disclosed. This is because when I moved from Baker & McKenzie to UBS in 2006, I lost all of my emails that had been on the Baker & McKenzie server.

*The Collaboration Agreement*

4.10    I spent the Christmas holidays with my family on the West Coast of the US. I was aware during this time that Rex was in contact with Todd and had followed up for his comments on the draft Joint Venture agreement, but I was not directly involved in any of those exchanges.

EPW1/45

- 13 -

4.11    I recall discussing with Rex that, at this time, the KRG had made it known that it wanted competitive bids for concessions on an expedited basis, and that Excalibur had begun to come under significant pressure to bring its E&P partner to Kurdistan quickly in order to meet with the OGE and to bid for a block as soon as possible. Dabin had advised Rex that it was increasingly worried about being able to keep Excalibur in the running to obtain an oil block if Excalibur was unable to deliver an E&P company in relatively short order. I understood therefore that there was an increasing urgency to get Gulf Keystone's comments on the draft Joint Venture Agreement and to sign an agreement so that a visit to Erbil with Gulf Keystone could be arranged.

4.12    On January 13, 2006, I was copied in on an email from Rex to Todd, suggesting that the agreement might be speeded up if Todd put his lawyers directly in contact with me. In the event, I was not contacted by Todd or by Gulf Keystone's lawyers. I recall that Todd's wife had just had a baby, and so he was not at work full time which meant that Rex was having some trouble contacting him.

EPW1/51

4.13    On January 25, 2006, Rex forwarded to me a letter and a draft "*collaboration, evaluation and bidding  group agreement*" (the "**Collaboration Agreement**") that he had just received from a Steve Goda on behalf of Todd. By this time (although I cannot now recall precisely when), Rex had described the deal with Gulf Keystone to me in more detail. Rex initially described them to me as being a small Bermudian E&P company based in London with a flamboyant CEO and an ongoing project in Algeria. I recall that Rex was slightly hesitant that the KRG would approve of Gulf Keystone as the concession's operator given its small size (it was merely a "*pink sheet*" company quoted on the London AIM), and the fact that it had only a single project under its belt, but that he hoped that they would be sufficient.  Rex also told me that he and Todd had agreed to a 50:50 split, in the joint venture.

EPW1/51A

4.14    The cover letter that Rex forwarded to me was signed by Todd as "*President of Texas Keystone*" and stated that, given the risks involved the shareholders and directors of the company felt compelled to propose an 80:20 sharing arrangement. This was obviously different than the 50:50 split which I had understood that Todd and Rex had previously agreed to. The attached draft agreement was also in the name of Texas Keystone, although it contained an option for Texas Keystone to assign part (but not

all) of its interests to Gulf Keystone. Given the speed of negotiations up until this point, Rex had not mentioned anything to me about what Texas Keystone's role was to be in the bidding process.

4.15   I telephoned Rex and discussed the draft agreement with him. He explained that Texas Keystone was a privately-owned oil and gas company based in Pittsburgh, Pennsylvania specializing in US-based oil development that was owned by Todd Kozel's family. Todd was the President of Texas Keystone. Todd was also one of the founding members of Gulf Keystone and served as its CEO. Of the two companies, only Gulf Keystone apparently had the expertise to take on the role of operator of an international E&P oil project. However, Gulf Keystone was not a US company, and given the KRG's requirement for a US company and OPIC's US ownership requirements, this is what Rex ideally needed.   Rex had been aware of Todd's connection with Texas Keystone and had explained to Todd Kurdistan's stated desire to award an oil concession to a US-led consortium. Rex had asked Todd if Texas Keystone could be utilized as the named operator or 'face of the consortium' with Gulf Keystone serving as the true operator in fact.   Rex explained that Todd had agreed to this and had said that this would not be an issue as he ran both companies and could effect whatever structure and optics were needed in order to make the deal work. My understanding therefore from speaking to Rex was that the deal concept was a three way consortium with the principal partners being Excalibur and Gulf Keystone, with Texas Keystone serving as the named operator in order to satisfy the KRG's specific requirements.

4.16   Although we had forwarded Todd a joint venture agreement for execution in order to document the bidding process among the parties, Rex explained that he thought that Gulf Keystone's legal team preferred to base the contract on their own standard form of agreement rather than ours. He also understood that additional revisions would likely require additional Gulf Keystone board approval.   I was not surprised by the fact that Gulf Keystone wanted to use their own standard form agreement and I did not attach any significance to the fact that the agreement was now called a "*collaboration, evaluation and joint bidding agreement*" as opposed to a "*joint venture agreement*".

4.17   Although we were asked to review the Collaboration Agreement and revert, my understanding from talking to Rex was that this was largely a '*take it or leave it*' negotiation and that any significant changes to the agreement would need to be reviewed and approved by Gulf Keystone's board of directors which would take time. I knew that Rex was coming under increased pressure from Dabin to return to Erbil with a consortium and that Excalibur had very limited time to look for a suitable replacement E&P company if this contract could not be agreed to.

4.18   Rex and I also discussed the proposed percentage split that Todd had offered, namely 80:20 as opposed to the previously agreed 50:50. We both felt that, while together Texas Keystone and Gulf Keystone met the KRG criteria, it was Excalibur which had the contacts on the ground and the OPIC backing and which was bringing the consortium together, and so a 50:50 profit split was more than fair. However, as I have explained above, Excalibur had limited time to find a replacement company if Todd pulled out, and so we agreed that Excalibur should counter offer with a proposal of 60:40.

4.19   Having spoken to Rex about the deal concept, I proceeded to review the terms of the draft Collaboration Agreement.   Although the structure of this agreement was different from our joint venture agreement in that Texas Keystone was the named counterparty and had a unilateral right to assign to Gulf Keystone, when I reviewed the Collaboration Agreement (including the assignment provisions with the Deed of Adherence), given what Rex had told me about the respective roles of Gulf Keystone and Texas Keystone in the consortium, I did not think it was a problem that Gulf Keystone was not a signatory to the Collaboration Agreement.  I did not spend much time on this issue as it was, to me, inconceivable that Gulf Keystone could, lawfully, receive some (let alone all) of the benefits of the Collaboration Agreement while avoiding its responsibilities and legal obligations to Excalibur.   The primary consideration was that Gulf Keystone would be the main player from the outset and that Texas Keystone would have only a very limited role.

4.20   I have been asked whether I was concerned that it did not name Gulf Keystone as counterparty. As I have said above, I did not believe that this was a problem. Although the Agreement named Texas Keystone as the counterparty, in my view the

agreement was still consistent with, and reflective of, there being a tripartite joint venture between Excalibur, Gulf Keystone and Texas Keystone.

4.21   I also recall being comforted that, although Todd had sought to dilute Excalibur's percentage at the last minute, the draft agreement nevertheless gave Excalibur an equal voting right in the consortium pursuant to the Operating Committee provisions.

4.22   I also looked at the assignment provisions in the draft agreement. I have been asked what I thought the effect of those provisions was, and whether I thought, as the Defendants now allege, that they were inconsistent with Gulf Keystone being a party to the Collaboration Agreement from the outset. In my view, the assignment provisions were not inconsistent with Gulf Keystone already being a party to the Collaboration Agreement. My understanding from the outset was that Gulf Keystone was a part of the consortium and that the intention was that it would also be party to the Collaboration Agreement, even though for cosmetic reasons it was not a signatory. The purpose of Texas Keystone's unilateral right to assign part but not all of its participation interest in the Collaboration Agreement to Gulf Keystone was to give the two consortium members, Texas Keystone and Gulf Keystone, the flexibility down the line to carve-up their portion of the deal between themselves, determining the appropriate participation interest for Gulf Keystone at such time. I understood from my discussion with Rex that the intention was that Gulf Keystone would be playing the major role as between itself and Texas Keystone, and that Gulf Keystone would therefore be receiving the majority of any resulting economic benefits in any deal that was signed with the KRG; it was just a matter of when this carve-up would be formally effected as between Gulf Keystone and Texas Keystone. Accordingly, I saw the assignment provisions as providing for an internal mechanism between Gulf Keystone and Texas Keystone rather than them having a bearing on the identity of the parties to the Collaboration Agreement at the outset. Other than the equity split between Gulf Keystone and Texas Keystone, I believed that all other issues had already been agreed, in particular the confidentiality and non-circumvention provisions which were there for the protection of the consortium as a whole. There was no suggestion that either Texas Keystone or Gulf Keystone could pursue opportunities in Kurdistan alone and on their own behalf – once the Collaboration

==Agreement was in place this was to be a collaborative venture with each participant bringing its own strengths to the effort.==

4.23    I am, of course, aware that Gulf Keystone now says that it was never bound by the Collaboration Agreement even though, exactly as planned, it has come away with most if not all of the economic benefit of the consortium's efforts. The idea that Gulf Keystone was somehow operating in its own right and independently of the consortium is not something that or I considered to be the case at the time. As far as I was concerned, the only outstanding question was when, and to what degree, Gulf Keystone and Texas Keystone would formally carve-up as between themselves their portion of the consortium, and it was to this that the assignment and Deed of Adherence mechanics in the Collaboration Agreement were directed. I had no reason to believe that Gulf Keystone or Texas Keystone would later suggest that Gulf Keystone owed no obligations whatsoever to Excalibur pending the conclusion of internal wrangling between Texas Keystone and Gulf Keystone. This was particularly so because Gulf Keystone took charge of the Texas Keystone/Gulf Keystone part of the consortium from the outset whilst Texas Keystone was almost entirely passive.

4.24    I am not, in any event, aware of any steps taken by Gulf Keystone as an actor independent of the consortium.  Gulf Keystone had no previous dealings in Kurdistan and no political influence there, and they relied very heavily on Excalibur and in particular on Excalibur's local representatives, Dabin.  It, of course, did not occur to me at the time that Gulf Keystone would extract every benefit it could from Excalibur and from Dabin and then cut Excalibur adrift.  Nor did it occur to me that Gulf Keystone would later disclaim any obligations whatsoever to Excalibur. Gulf Keystone's behavior throughout 2006 and most of 2007 was just not consistent with this.  If it had come to my attention that Gulf Keystone was maneuvering to exclude Excalibur, I am sure that Rex and I would taken every step possible to ensure that our position was not undermined and that Excalibur's interest was fully recognised.  We would, in particular, have relied on Dabin to take active steps to protect Excalibur's position.  As a last resort, we could have directed Dabin to suspend negotiation of the bid.

4.25    Accordingly, I do not accept the argument now being made by the Defendants that Gulf Keystone was not also a member of the consortium and was not bound by the

Collaboration Agreement. I do not believe that Gulf Keystone itself believed that to be the case and certainly Excalibur was not of that view. Texas Keystone was no more than a passenger in the overall effort and it was clear to me, and I am sure to everybody else, that Texas Keystone was only there as a place-holder for Gulf Keystone which conducted itself throughout, at least until after the Shaikan PSC was signed, in a manner consistent with its being bound by the Collaboration Agreement and respectful of Excalibur's rights and interests.

4.26   I have also been asked to comment on the suggestion which the Defendants have made that the Collaboration Agreement was only a bidding agreement which does not of itself give the parties any rights to share in the proceeds of a successful bid. Although Gulf Keystone had replaced our draft "*joint venture agreement*" with a "*collaboration, evaluation and bidding agreement*", I did not consider that what was proposed was an agreement that covered only the bidding process, not least of all because it included non-circumvention provisions and it specified the relative equity interests of the parties in whatever contract resulted from a bid. Accordingly, I do not accept the suggestion now being made by the Defendants. As far as I was concerned, this was an agreement which would cover not just the bidding process but the consortium members' participation in respect of any concessions awarded as a result of a successful bid. Again, I think that the Defendants' arguments have been manufactured well after the event and bear no relationship to the realities as they were. The negotiation of the 70:30 split served a definite purpose, and I am not aware of it ever being suggested that the parties would seek a concession in some kind of vacuum and then sort out their interests in it at some later date. In 2006 and 2007, everyone knew precisely where they stood: Excalibur had a 30% interest and Texas Keystone and Gulf Keystone would share the remaining 70% in whichever way best suited them. It was no more or less complex than that.

4.27   I accordingly confirmed to Rex that I was comfortable with the Collaboration Agreement as drafted. I recall that Rex then reverted with our agreed 60:40 counteroffer. Todd then reverted with a 70:30 offer and, having discussed this again by telephone, we decided to accept on that basis. Shortly thereafter, Rex and Todd executed the Collaboration Agreement.

5.    **THE EVENTS OF 2006 AND 2007 PRIOR TO THE SIGNING OF THE PSCS**

5.1    I did not have a significant amount of involvement in the dealings between Excalibur and Gulf Keystone between the time that the Collaboration Agreement was executed in February 2006 and the award of the PSCs to the consortium in November 2007, other than dealing intermittently with certain contractual issues which I address below.

5.2    I was aware that Rex was spending a significant amount of time moving the bidding process along, and that this included making a substantial amount of the arrangements for the consortium's visits to Kurdistan, continued correspondence and co-ordination with KRG officials both in Kurdistan and Washington DC, and almost daily interaction with Azzat Othman of Dabin, and Todd Kozel and a number of Gulf Keystone's exploration and engineering staff, including David Mackertich and David Clark.   My understanding was, and remains, that the only interaction that Rex had with Robert Kozel or any other officer or employee of Texas Keystone occurred when the issue of the transfer of Texas Keystone's interests to Gulf Keystone arose between March and June 2007 (I explain this further below) and that this was the case because, in nearly every sense, Gulf Keystone was both in charge of, and handled, the Kurdistan bidding process (whether from a management perspective or a business/economic perspective). As mentioned above, Texas Keystone was almost completely passive, and Excalibur's dealings were with Gulf Keystone, with whom there was regular contact.

*The proposed sale of Gulf Keystone*

5.3    On March 15, 2007, I received an email from Rex headed "*Please review Texas to Gulf Assignment*". Attached was an agreement between Gulf Keystone and Texas Keystone which provided for the transfer of Texas Keystone's entire interests (70%) to Gulf Keystone. The agreement had been signed on behalf of Texas Keystone. Attached to the agreement (as Schedule 1) was a Deed of Adherence which was to be executed by Gulf Keystone, Texas Keystone and Excalibur. Again, the Deed of Adherence had been signed on behalf of Texas Keystone.        EPW1/52

5.4    I understood from discussions with Rex the previous month that the background to this agreement was a proposed sale of Gulf Keystone to RAK Petroleum. Under clause 3.3 of the Collaboration Agreement, the option to transfer Texas Keystone's

interests to Gulf Keystone unilaterally was limited to "*part but not all*" of those interests, and so I understood that Texas Keystone needed Excalibur's written consent in order to transfer 100% of Texas Keystone's interest to Gulf Keystone. I discussed the position by telephone with Rex and we decided that, given the uncertainty surrounding the potential sale of Gulf Keystone, we should find out more before agreeing to the transfer.

5.5     On March 21, 2007, I made some amendments to a draft email that we were considering sending to Todd regarding the proposed transfer, the purpose of which was to see if Todd would be willing to insert some form of buy-out clause into the Collaboration Agreement in the event of a change in Gulf Keystone's management (primarily, the replacement of Todd) after the buyout of Gulf Keystone.  I am not sure whether this email was ever sent, but I do recall that Rex did not agree to permit Texas Keystone to transfer all of its rights to Gulf Keystone or return the paperwork in executed form as requested at this time. Excalibur did not agree to the request for Texas Keystone to transfer all of its interest to Gulf Keystone because the KRG still wanted to be seen to be working with US-led consortiums, and we were concerned that such a transfer would significantly reduce our chances of obtaining a concession. By failing to consent to the transfer, Excalibur was also strengthening Todd's position at Gulf which we felt was important at the time given the headway he had already made with the KRG. Rex also believed that he had a strong relationship with Todd whom we felt had been an extremely valuable part of the consortium.  Finally, given that the new potential owners of Gulf Keystone were Arab, we were also concerned that the KRG may not have viewed the new Gulf Keystone favorably.  In effect, Excalibur would have had a new partner in Gulf Keystone in the event of a takeover by RAK, and we were uncomfortable with this in particular because Todd, as the "*face*" of the consortium, would in all likelihood have disappeared from the process altogether.

EPW1/75

5.6     I understand that the Defendants now allege that Excalibur's refusal to consent to the transfer of all of Texas Keystone's interest means that Gulf Keystone never became a party to the Collaboration Agreement. As I have explained above, there was never any doubt in my mind that Gulf Keystone was a party to the Collaboration Agreement from day one and that whether or not Excalibur consented to Texas Keystone's

unilateral right to assign to Gulf Keystone under the Collaboration Agreement had no bearing on this because such assignment solely impacted the amount of the internal carve-up between Gulf Keystone and Texas Keystone. Excalibur was not averse to Gulf Keystone taking over the majority of Texas Keystone's interest, or even the entirety of its interest, in due course, provided this would not adversely affect the negotiations with the KRG. It was, however, averse to Texas Keystone assigning 100% of its interest in the Collaboration Agreement as this would have negated the strategic advantage of a US-led consortium and might have caused the disappearance from the scene of Todd Kozel. The consortium would have had to begin negotiations afresh, with a new lead negotiator supplied by RAK. I still believe that we made the right call - despite the fact that Excalibur did not return the paperwork as requested, Todd Kozel and Gulf Keystone, as opposed to Texas Keystone, continued to lead the Kurdistan bidding process on behalf of the consortium. Continuity had been maintained in this way.

6. **NOVEMBER/DECEMBER 2007: THE PSCS AND THE DEFENDANTS' REFUSAL TO ACKNOWLEDGE EXCALIBUR'S INTERESTS**

6.1  I have read paragraphs 23.1 to 23.95 of Rex's witness statement and can confirm that this accords with my understanding of the exchanges that we had with the Defendants at the back end of 2007 after the PSCs for the Shaikan Block and the Akri-Bijeel Block were signed with the KRG. Rex has set out in detail the exchanges that he had with Todd, Iain Patrick and Iain Kinnear. I address below the particular aspects of those exchanges which I was involved in.

6.2  On October 30, 2007, I received a call from Rex to say that the consortium had finally closed the deal with the KRG. Rex told me that he had received a text message from Todd, who had just finished a meeting with Dr Ashti Hawrami (the Oil Minister) in London, which read: "*Contract erbil finished.*" Rex had then had a telephone call with Todd, who had explained that the formal signing ceremony was due to take place in Erbil. Rex was clearly delighted, and rightly so as all his hard work over the past three years had finally paid off.

6.3  Rex was keen to attend the signing ceremony with Todd. Before he met up with Todd, I advised him to first put together a list of all the information he needed from Todd

and his team in order to put together a '*pitchbook*' for investors. This included financial information on Todd and the Defendants, geological data, economic modelling, and of course the signed PSCs. This pitchbook was critical in order to attract investors.

6.4   In the event, Rex did not travel to Erbil for the signing ceremony because Todd did not send him the details. Nor, in the interim, did Todd send through any of the information that Excalibur needed in order to put together the pitchbook, in particular the deal terms that had been agreed.

6.5   On November 6, 2007, the KRG formally announced the conclusion of the PSCs on its website and Rex was able to forward this announcement to investors letting them know that a more detailed packet of information would be available soon. Rex continued to chase Todd for copies of the signed PSCs. I was becoming suspicious of Todd's behavior because he was not communicating with his primary business partner on the deal at precisely the time when business norms would suggest that he would be most excited about success and most interested in co-ordinating with Rex. Rex, however, who by that time considered Todd as a friend and not just a business partner, was much slower to realize what was happening and was inclined to give Todd the benefit of the doubt.

6.6   I recall that, on November 11, 2007, Rex flew to Florida to have dinner with Todd and to discuss the next stages. Prior to this meeting, I had suggested to Rex that he should ask Todd to sign letters acknowledging Excalibur's interests in the PSCs. Given that Excalibur's name was not on any of the PSCs, we needed something in writing from the Defendants acknowledging Excalibur's role so that we could show this to potential investors.

6.7   Following this meeting, Rex called me and said that Todd had agreed to provide acknowledgement letters. Rex then drafted the letters of acknowledgement and I reviewed them. However, contrary to what he had promised Rex, Todd never signed the acknowledgement letters.

EPW1/77

- 23 -

*The interest from UBS and my telephone call with Iain Patrick of November 13*

6.8   While Rex was in Florida seeing Todd, I was making enquiries with potential investors. I had discovered that UBS had an energy finance division within its Investment Bank. Having made some internal inquiries, I learned that there was definitely an initial interest in reviewing Excalibur's deal for possible funding.   EPW1/79

6.9   On November 12, 2007, I emailed Rex to tell him about this development and told   EPW1/83 him that he needed to put together a full write up to present to UBS. The following day, Rex sent me an email attaching everything he had at that stage . Having reviewed this information, I did not think that it would be sufficient to enable UBS to properly   EPW1/84 evaluate the deal. In particular, Rex only had a Word version of the PSC for the Shaikan Block, not a signed version, and he had still not received the signed letters of acknowledgement that Todd had promised him two days earlier.

6.10   I was concerned that, instead of been seen as a small company with vision who had originated a major Middle Eastern oil concession, Excalibur would be seen merely as an '*unrelated broker*' in a third world business deal. In third world business deals, intermediaries, brokers, and peddlers of influence are everywhere, and legitimate sources of capital are extremely wary of these types of players in general. Anyone who has tried to work in the third world through intermediaries knows how difficult it is. Most claims by these brokers are false and their deals are ultimately non-existent, meaning that due diligence takes significantly longer. Moreover, even when there is an existing deal, it is a near certainty that multiple levels of payoffs will be required. Not only does this become a due diligence '*nightmare*' for any legitimate source of funding, but it negatively changes the economics in a major way since each layer of intermediary generally requires its separate payment, let alone the increased due diligence costs (such as Foreign Corrupt Practices Act or FCPA issues for US companies). Accordingly, Rex and I decided that I should contact either Todd or Iain   EPW1/225 Patrick, who was the Commercial Director of Gulf Keystone, in order to explain UBS's interest and get the information that Excalibur needed. I also drafted up an   EPW1/227 email to send to Todd asking for the documentation that UBS needed in order to   EPW1/229 perform its due diligence.

6.11    In the meantime, Rex had been in contact with Todd's assistant in London, Margaret
        Berry, and had arranged for Iain Patrick to call me. I missed his first call, but I
        subsequently called him back and we spoke for about 15 minutes. I outlined the
        interest from UBS and explained the documentation that we needed. We also
        discussed the position regarding Gulf Keystone's current relationship with Excalibur.
        Iain told me that, although Gulf Keystone considered itself to be a partner with
        Excalibur with respect to the Kurdistan PSCs, the legal documentation reflecting the
        companies' interests had not yet been finalized due to incomplete documentation of
        Excalibur's approval of Texas Keystone's transfer of its participation interest to Gulf.
        However, he indicated that this should not have an effect on the final terms and that
        Gulf Keystone would be working internally and with Excalibur on an expedited basis
        to determine how best to document the existing understanding between both parties. I
        indicated that, as Rex's brother, I was actually familiar with the terms of the deal and
        was not in agreement with the idea that Excalibur needed to complete any further
        documentation. However, the call continued in a cordial manner, and Iain Patrick said
        that these issues could likely be worked out in short order and that he would assist in
        providing the information that we needed. At one point, Iain Patrick told me that the
        deadline for raising the signature bonus was December 6, 2007, roughly three weeks
        away.  I explained to Iain that this was the first time that we had learned of this
        deadline, that the funding timeline was extremely short, and that my understanding of
        the Collaboration Agreement was that Excalibur was required to agree to any final
        funding timetable whether through the Operating Committee established by the
        Collaboration Agreement, or through the Joint Operating Agreement (which had
        obviously not yet been executed or even negotiated).

6.12    Later that day, November 13, 3007, I adapted the email that I had drafted to send to
        Todd and instead sent it to Iain (copied to Todd and Rex) as a follow-up to our call.   EPW1/230
        At no time did we discuss the need for UBS or Excalibur to execute any type of
        confidentiality agreement.

6.13    Later that day, I received a response from Iain Patrick saying that he would send       EPW1/235
        through a fuller response to my requests and a confidentiality agreement the following
        day. In response to point 5 of my email, in which I had outlined our conversation
        regarding the relationship between Gulf Keystone and Excalibur, Iain Patrick

commented: "…*I did not and cannot give any assurance regarding Gulf Keystone's position beyond the fact that this company has no contractual relationship with, or legal obligation to, Excalibur. Any discussion about Excalibur taking any interest in Shaikan will be without prejudice to that position. I will send you a fuller response to your requests, including a Confidentiality Agreement, tomorrow*". Since this was completely inconsistent with our earlier call, it became instantly apparent to me that Gulf Keystone was potentially minded to breach the Collaboration Agreement that it had entered into with Excalibur, and I set about attempting to prevent this from happening.

6.14    I forwarded this email to Rex and told him to call Todd. I also told him that before he spoke to Todd he should gather together all his emails and re-read the contract so that he was in the best position to ask Todd how he intended to address the issue of Excalibur's standing. I continued to mull over the issue and my call with Iain Patrick. At this point, Rex and I were unsure whether this was merely Iain's personal position or whether it had been communicated to him by Todd. We then set about attempting to ascertain what was going on. I considered that the problem was probably that Gulf Keystone did not want to have further negotiations with the KRG and MOL. However, in my view, this was not necessary. Under the Collaboration Agreement, Excalibur had a 30% interest in the PSCs that the Defendants had negotiated with the KRG. I knew that we could structure Excalibur's equity interest in any number of different ways, and that the Collaboration Agreement was broad enough to cover multiple possible arrangements. It was therefore perfectly possible for Gulf Keystone to recognise Excalibur's interests in the PSCs, for example by enabling Excalibur to invest in Gulf Keystone International. About half an hour later, I sent Rex a further email outlining this idea. Later still, I sent him an email with more ideas for his call with Todd.    EPW1/240 EPW1/245 EPW1/246

6.15    I recall that Rex subsequently spoke to Todd. Later that evening, he sent me an email saying that Todd had assured him that all was well and that they were due to have a further call the next day to discuss things further. I was pleased to hear that things seemed back on track, not least because the following day I was due to fly to Morocco with my wife and child for 2 weeks vacation. Before we left, I emailed Rex to remind him that we needed to get a delay on the funding timeline as December 6, 2007 was    EPW1/247 EPW1/249

not realistic for anyone to achieve. I also told him to contact Jon-Paul Javellana, a long time business associate and personal friend of mine, to see if there was any interest from Deutsche Bank in funding Excalibur's interest in the PSCs.

### The draft Confidentiality Agreement from Gulf Keystone

6.16    Unfortunately, my time away was not as relaxing as it might have been. On November 14, 2007, I received an email from Iain Patrick attaching a confidentiality agreement for UBS to sign before Gulf Keystone would provide any of the information that I had discussed with him on our call the day before. I was also copied in on an email from Iain Patrick to Rex attaching a similar confidentiality agreement for Excalibur to sign. Upon reviewing both documents, I noticed straight away that they posed a major obstacle to Excalibur's ability to fund raise and in particular to meet the December 6, 2007 deadline. Given the detailed nature of the agreement (as opposed to a simple waiver which would be market standard), a potential funding institution's legal department was likely to take several weeks to review it. UBS subsequently estimated approximately 3-4 weeks for this process alone which would clearly take Excalibur beyond the December 6 deadline. Since many funders were not even interested in engaging in the lengthy NDA negotiation process until they felt comfortable with the fundamentals of the underlying deal, Gulf Keystone's NDA made Excalibur's funding process extremely difficult, and effectively foreclosed the extremely short deadline Gulf Keystone was seeking to unilaterally impose.  For example, Christopher Pinho of UBS in an email dated November 15, 2007 stated that "*UBS will not sign the nda unless we think that there is a trade to get done.*"  Worse still, since the confidentiality agreement included a provision stating that Excalibur currently had no contractual interest in the PSCs but was merely negotiating for "*the possible acquisition of an interest*" (as opposed, for example, to "*the funding of Excalibur's contractual interest in the PSC due to a bidding agreement executed in February of 2006*"), it became quite clear to Excaibur's potential funders that Excalibur's deal had not been fully negotiated and approved, and that Excalibur's potential interest was illusory in that its funding approval might still be rejected by Gulf Keystone, increasing the deal risk as well as the timeline required to close.  For example, paragraph 10 of the NDA Gulf Keystone required Excalibur to be signed by potential funders provided:  "*[A]ny prior or future proposals or offers made in the*

EPW1/251
EPW1/260
EPW1/264

*course of the discussions between the parties and/or Excalibur are implicitly subject to all necessary management and government approvals and may be withdrawn by either for any reason or for no reason at any time.*" Not only was Gulf Keystone's characterization of Excalibur's right to invest in the PSC incorrect, but it clearly contradicted Excalibur's claim to funders that we had an interest in the deal and had been involved from the beginning which would immediately make funders suspicious. More importantly, this agreement made it extremely difficult, if not impossible, for Excalibur to meet the December 6, deadline. Also, none of this language had anything whatsoever to do with confidentiality. It was a not at all subtle attempt by Iain Patrick to erase Excalibur's role in the deal.

6.17    Rex and I discussed the position over the telephone and I drafted an email for him to send to Todd pointing out that the requirement that Excalibur had to get each potential investor to sign up to a confidentiality agreement in the terms proposed was not only off-market, but it had effectively foreclosed any possibility of Excalibur meeting the December 6 deadline.    EPW1/273

6.18    I also advised Rex to send Todd a signed copy of the Deed of Adherence that he had been sent back in March 2007 relating to a transfer of 100% of Texas Keystone's interest to Gulf Keystone.  Although I did not think that this Deed of Adherence had any substantive relevance, Iain Patrick had indicated that it was Gulf Keystone's view that Excalibur's failure to execute transfer documentation was standing in the way of further progress, and this deed was the only possible document to which he could be referring.  I therefore suggested to Rex that he execute the March 2007 Deed of Adherence in order to move the process forward and then to send it to Todd asking him to sign it, thereby putting the burden on Gulf Keystone to complete the contractual step that it said was for whatever reason necessary.  Rex subsequently sent the signed Deed of Adherence by email to Todd on November 15, 2007.  Todd never returned a signed version of the Deed of Adherence to Rex.    EPW1/275

6.19    The following day, Rex was due to have a telephone conference call with UBS's energy finance division.  As a Director at UBS, I did not think that it was appropriate for me to join the call, but I drafted up an email with ideas for Rex for the call.    EPW1/278
Although UBS was interested in providing funding, it was unable to get comfortable with the impediments introduced by Gulf Keystone and ultimately decided not to

move forward with a funding engagement.  By this time, Rex was also pursuing other EPW1/289
avenues including Lazard and Deutsche Bank.

6.20   Later that day, Rex received a call from Todd about the confidentiality agreement. He
subsequently sent me an email explaining what Todd had said. In his email, Rex set
out Todd's exact words to him which were "*we are not going to screw you out of the
deal*".  Rex also explained that Todd had also told him that they needed Excalibur to
sign the confidentiality agreement because of Gulf Keystone's own agreements with
the KRG and that Iain Patrick had misspoken when he said that Gulf Keystone did not
have an agreement with Excalibur.  Again this was encouraging, but I did not think
that Excalibur could sign the confidentiality agreement in the terms that had been put
forward by Iain Patrick as it was flat out wrong when it said that Excalibur only had a
potential interest. In response, I told Rex that I would rework the Agreement. EPW1/291

6.21   The following day, I emailed Rex a redraft of the confidentiality agreement.  In EPW1/293
particular, I amended clause 1 to refer to the fact that Excalibur had an existing EPW1/294
participation in the PSCs for the Shaikan Block and Akre-Bijeel Block. Following EPW1/305
EPW1/311
further exchanges with Rex by email regarding the terms of the amended EPW1/316
confidentiality agreement, on November 18, 2007, Rex sent it through to Iain Patrick EPW1/321
copied to Todd. EPW1/329
EPW1/337
EPW1/345
6.22   At paragraphs 23.18 to 23.41 of his witness statement Rex explains the subsequent EPW1/351
exchanges that he had with Iain Patrick regarding the draft confidentiality agreement EPW1/357
of all which he discussed with me by email before sending. EPW1/369

6.23   On November 23, 2007, Rex received an email from Iain Patrick, which he forwarded EPW1/383
to me and which purported to '*clarify*' the basis on which Gulf Keystone would
provide Excalibur with the information that it needed to effectively fundraise.  This
email contained a new set of demands that Gulf Keystone was trying to unilaterally
impose on Excalibur, to include approval of Kalegran and Texas Keystone, as well as
the KRG.  Since these conditions effectively provided Todd (through Texas Keystone)
with an unlimited veto right, I concluded that Gulf Keystone was effectively setting
up Excalibur to fail, and I felt that it was time for Excalibur to engage lawyers to
protect its position. Accordingly, I began to make enquiries about which firm
Excalibur should instruct. EPW1/390

6.24   Around this time, I became aware that Rex was coming under increased pressure from Iain Kinnear to sign Gulf Keystone's version of the confidentiality agreement. Ultimately, Rex felt that he had no choice but to sign the confidentiality agreement if we wanted to get the information that Gulf Keystone was wrongly withholding from us. Having discussed it with Rex, I advised that if he signed the agreement, he should do so under protest and make it clear that we did not accept that Excalibur did not already have an interest in the PSCs.

6.25   On November 24, 2007, Iain Patrick started to send through to Rex the underlying documentation. This included a copy of an agency agreement between Gulf Keystone and Dabin, signed the day before the PSCs were formally executed, which provided that Dabin were to be Gulf Keystone's exclusive agents in Iraq. I was amazed when I saw this, given that Dabin was Excalibur's long term local representative under an agency agreement with Excalibur. Of specific concern were the provisions in Gulf Keystone's agreement with Dabin which contained an exclusivity provision precluding Dabin from working with Excalibur, as well as confidentiality provisions preventing Dabin from sharing any further information regarding the PSCs with Excalibur. In short, Gulf Keystone's agreement with Dabin virtually nullified Excalibur's agreement with Dabin, thereby isolating Excalibur with no access to its local partner, and hence, significantly reducing Excalibur's access to the KRG and the Ministry of Natural Resources.

EPW1/398

6.26   Over the next few days, Rex sent me regular updates on the exchanges that he was having with Gulf Keystone and Iain Kinnear and potential investors.

*The meeting of December 3, 2007 in London*

6.27   Although Gulf Keystone had now released some of the information that Excalibur needed in order to fundraise, the issue of the December 6 deadline (which Iain Patrick had reiterated in his November 23 email) had still not been resolved.

6.28   On Sunday December 2, 2007, Rex travelled to London for a meeting with the board of Gulf Keystone the following day. I was aware that Iain Kinnear had arranged this meeting. I did not attend, but I helped Rex to prepare a presentation to make to the board. The main point of this presentation was that Gulf Keystone could recognise

EPW1/403

Excalibur's interest in the PSCs simply by letting Excalibur invest in Gulf Keystone International or some other Special Purpose Vehicle.

6.29   Later that day, Rex emailed me saying: "*Either they are going to give me 60 days or buy me out. I have to decide*".  Of these two options, I thought that the buy-out option was better.  Although I was confident that Excalibur would be able to raise the necessary funding, I thought that 60 days was still too tight a timeframe to do so.  I set this out in an email to Rex later that day.  I heard nothing further from Rex and so the following day I sent Rex a follow-up email.   EPW1/405  EPW1/406

6.30   The following day, December 5, 2007, Rex responded saying that he had made an offer of $5 million in return for 85% of Excalibur's share.  While I thought that this did not reflect the amount of work that Excalibur had contributed to the deal, I knew that the cost of legal proceedings would be large and so I did not dissuade Rex from this offer.   EPW1/407

6.31   On December 7, 2007, I received a very short email from Rex saying that as yet there was no deal and that he had heard nothing from Todd since the previous Tuesday morning.  He also said that he was leaving for Israel the following day.  In response, I advised Rex by email to stay in London and to follow through with this offer and to push for a response from Todd.   EPW1/408

6.32   Later that evening, I received an email from Rex headed "*Major Problem*".  The email contained a draft message to Baker Botts asking for assistance to sort out a situation between Gulf Keystone and MOL.  Rex later explained to me that he had approached Baker Botts to get the contact details for MOL because, as a party to both PSCs, they were the obvious candidate to buy Excalibur's share.  Baker Botts had written to MOL outlining Excalibur's proposal which had apparently embarrassed Todd, and Todd had now severely cut the price at which Gulf Keystone was prepared to buy Excalibur's share.   EPW1/410

6.33   Given the Collaboration Agreement and prior discussions with Todd, I did not think that Rex had done anything wrong in making this approach.  Excalibur had an existing interest in the PSCs, and at the December 3, 2007 meeting, Todd had indicated that he was open to the idea of Excalibur selling that interest in a buy-out arrangement.  MOL was an obvious candidate to approach with a buy-out proposal

because, via its subsidiary, Kalegran, it already had an existing interest in the PSCs, had already performed its due diligence, and would more quickly be able to verify Excalibur's legal rights given its existing relationship with Gulf Keystone. In fact, given Gulf Keystone's refusal to provide Excalibur with any documentation supporting Excalibur's right to invest in the PSC (not to mention if Excalibur were ultimately forced to meet Gulf Keystone's unilaterally imposed funding deadline), MOL was probably the only potential funder. My view was that Todd was using Rex's approach to MOL as an excuse to reduce the amount that he was prepared to pay for Excalibur's interest and I did not buy that this had caused any embarrassment at all. In hindsight, I think the anxiety was caused by Todd having failed to tell MOL anything about Excalibur's participation.

### Iain Patrick's email of December 20, 2007

6.34    As Rex sets out at paragraph 23.91 of his statement, we heard nothing further from Gulf Keystone until December 20, 2007, when Rex received an email from Iain Patrick. Again, this email was factually incorrect as it referred to negotiations between Gulf Keystone and Excalibur, thereby implying that Excalibur did not have an existing interest. <span>EPW1/412</span>

6.35    On December 21, 2007, Excalibur instructed David Williams of Cadwalader, Wickersham & Taft LLP ("**Cadwalader**") to take up the correspondence with Gulf Keystone.

### 7.    THE EVENTS OF 2008 THROUGH 2010

7.1    I have read paragraphs 24.1 to 24.30 of Rex's witness statement and can confirm that Rex accurately reflects the course of our negotiations with Todd through 2008, and our continued attempts to raise finance to support Excalibur's interest in the PSCs.

7.2    I always had the impression that Todd was not being straight with us during these negotiations. In particular, we would go for weeks without hearing anything from opposing counsel and the reason then given for the delay was that Todd was in Iraq and so unable to review emails, yet Rex never had any problems answering emails whilst he was in Iraq. In many ways, Gulf Keystone's position was condescending.

For example, on the first occasion that David Williams of Cadwalader made contact with Todd in January 2008, Todd had laughed down the telephone at him.

7.3    There were lengthy negotiations during 2008 over the possibility of Gulf Keystone buying Excalibur's interests and the terms on which of the sale agreement which was under discussion.  The main sticking point throughout these negotiations was that we had difficulty agreeing on the wording of a suitable buy-out provision pursuant to which Excalibur would be entitled to share in the proceeds of a successful sale by Gulf Keystone of its interests (and the interests it would be buying from Excalibur) to third parties.  Gulf Keystone did not object in principle to the inclusion of such a provision, but kept proposing revisions which were increasingly restrictive and undermined the value of any buy-out provision to Excalibur.

7.4    On several occasions, even after both sides had made revisions to the sale agreement and execution appeared imminent, Gulf Keystone returned with additional revisions to the buy-out provisions, creating ever-increasing situations where Excalibur would receive no payment at all.  For example, in the provision whereby Gulf Keystone would be liable for payment in the event of a sale of a portion of its interest, it attempted to create numerous carve outs without explanation which forced us to consider the myriad of ways in which Gulf Keystone could monetize its interest without making any payment to Excalibur.  One way Gulf Keystone would be able to escape liability to Excalibur through its revisions was through the sale of a non-majority or non-controlling interest in the PSC.  Since Gulf Keystone and Texas Keystone collectively held 80%, this would mean that it could monetize over 60% of its interest to a single party without owing anything to Excalibur, as well as 100% of its interest by selling slightly less than 63% to one party and the remainder to a second.

7.5    Gulf Keystone also attempted to carve out any sale to Kalegran (or a subsidiary or affiliate thereof).  This was especially alarming to us since Kalegran would be the most likely option for a sale given that it was already a party to the PSC, it already had a relationship with Gulf, it had a significant amount of cash, and it was known to be searching for additional blocks.  This was especially troublesome given some additional revisions which Gulf Keystone added to the agreement (after the initial revisions had already been approved) which created significant doubt over whether a buyout was currently being contemplated or already in process, especially given Gulf

Keystone's recent press releases regarding its current funding needs (and the implication that it was having difficulty meeting its financial obligations under the PSCs). Gulf Keystone would not comment on the rationale behind the revisions. Gulf Keystone had also made revisions which had the result of carving out from the follow-on payment any circumstances where Gulf Keystone would receive substantial consideration outside of a true sale, such as leasing.

7.6 In the face of these and other revisions to the agreement and Gulf Keystone's persistent failure to address our concerns in any meaningful way, we ultimately came to the conclusion that Gulf Keystone was not dealing with us in good faith. As a final straw, after a long period where we heard nothing from Gulf Keystone, their counsel came back with additional revisions which gutted the earlier provisions by leaving Gulf Keystone (and any purchaser of Gulf Keystone) with clear avenues to completely avoid its obligations under the settlement agreement. As we had been advised by Gulf Keystone's legal counsel, Roy Powell with Jones Day, that Gulf Keystone's revisions were non-negotiable, we concluded that the probability of Excalibur ever receiving a follow-on payment under the proposed agreement was slim to none and that the negotiations had been fruitless.

7.7 Accordingly, we sent a letter to Gulf Keystone on July 1, 2008 through our legal counsel indicating that we could not accept their terms, but reiterating previous written and verbal offers submitted the prior month through counsel to fully finance our entire 30% share in accordance with the Collaboration Agreement. Although we hoped that showing Gulf Keystone that we were both willing and able to share in the financial risks of drilling and to defray a significant portion of Gulf Keystone's expenses and risk at a time when it appeared to be having difficulty fundraising would be an attractive offer, we never heard back from Gulf Keystone or its legal counsel. Should Gulf Keystone fail to accept our offer, we indicated that we were reserving our rights under the Collaboration Agreement and otherwise, and would revisit our options, whether through litigation or otherwise, once the exploratory drilling phase was complete.

7.8 As Rex sets out at paragraph 24.5 to 24.9 of his witness statement, throughout 2008 Excalibur had continued to pursue potential investors and had entered into negotiations with Prime Natural Resources Ltd ("**Prime**"). When we read Gulf

EPW1/413

Keystone's media release dated October 18, 2008, stating that it was actively searching for funding for the Shaikan Block we thought that this would serve as a great opportunity for both sides to address their issues in a meaningful and face-saving way. On October 28, 2008, Excalibur and Prime executed a Letter of Intent regarding Prime providing financing to Excalibur. With funding in hand, Excalibur once again approached Gulf Keystone, offering it the funding it desperately needed in return for resolving the contractual dispute and permitting Excalibur to take its rightful place in the deal. As Rex sets out at paragraph 24.30 of his witness statement, on December 5, 2008 David Williams wrote to Jones Day stating that Excalibur had funding sources in place and was ready to invest in the Shaikan Block in accordance with the original Collaboration Agreement as well as purchasing any additional interests that Gulf Keystone might want to farm-out. Once again, we reiterated our hope of reaching a mutually-acceptable agreement to resolve Excalibur's claim, as well as our intention to protect and enforce our legal position should that not arise, and once again, we received no response to our letter.

7.9     As Rex explains in paragraph 24.32 of his statement, we then decided to give up on our efforts to come to a negotiated solution with Gulf Keystone. We considered that we would have no choice but to litigate. We appreciated, however, that that it would be very expensive to bring a claim, and having already attempted to obtain funding to litigate the case, we knew that we would be in a much better position to obtain funding once it was confirmed that oil was in place in the blocks, and the value of the blocks was known. Although we had requested funding from Prime for litigation purposes, Prime was not willing to fund litigation against Gulf Keystone and had conditioned its funding on settlement of Excalibur's contractual issues with Gulf Keystone. Similarly, without a proven field, we were unable to raise funds from any other sources we approached. Accordingly, after explaining to Gulf Keystone in writing that our intention was to reassess our legal position after the drilling results, we therefore waited until that had happened, after which we did our best to obtain the necessary funding and legal representation. This, however, took time.

7.10    Like Rex, therefore, I reject the suggestion made by the Defendants that Excalibur was not prepared to take the risk and incur the costs of participation in the exploration of the blocks and then brought this claim opportunistically when it became apparent

that there are, indeed, substantial quantities of oil in the blocks.  That is not the case.
The existence of significant quantities of oil in the Shaikan block was confirmed in
early August 2009.  We had made numerous efforts to have Excalibur's participation
recognized before then, but these were either rebuffed or ignored by Gulf Keystone.
In the circumstances, Excalibur had no real choice other than to pursue its rights
through legal process.

7.11   The pursuit of the opportunities in Kurdistan and the ensuing negotiations with Gulf
Keystone had occupied the best part of three years and Excalibur had nothing to show
for those efforts, which Gulf Keystone had willingly and liberally taken advantage of
when it suited its purposes.  Although Rex had formed a friendship with Todd Kozel,
that was ultimately at Excalibur's expense as Todd had taken maximum advantage of
that.  I do not know when Todd decided to cut Excalibur adrift, but I do not think that
he did that fairly.  I believe that he did what he did because he calculated that
Excalibur would not have the resources or the appetite to pursue its rights through
litigation.  He was right to the extent that almost eighteen months of effort were
required by Excalibur to bring together the necessary funds to do that, but he was
otherwise wrong.

7.12   Finally, I have read very carefully the various versions of the Defenses put forward by
the Defendants.  I have not commented on these in detail because they bear no
relationship to the facts as I recall them.  In particular, they rehearse arguments
involving frustration, force majeure, governmental intervention and the like none of
which were ever mentioned or even alluded to in 2006, 2007 or 2008.  I note also that
the Gulf Defendants disclaim any material involvement in the Collaboration
Agreement or indeed in the efforts of this consortium.  To my mind this is fantasy.
Gulf Keystone was fully involved from the beginning, in early 2006, and as far as I
am concerned they would still be a penny stock company, if in existence at all (given
its failure in Algeria), were it not for the efforts of Excalibur and in particular those of
Rex.

**STATEMENT OF TRUTH**

I believe that the facts stated in this witness statement are true.

Signed: _____

Eric Putnam Wempen

13 April 2012

On behalf of: Claimant
Witness: E.P.Wempen
Statement: First
Dated: 13 April 2012

<u>**Claim No 2010 Folio 1517**</u>

**<u>IN THE HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION
COMMERCIAL COURT</u>**

**B E T W E E N :-**

**EXCALIBUR VENTURES LLC**

**<u>Claimant</u>**

**-and-**

**(1) TEXAS KEYSTONE INC**

**(2) GULF KEYSTONE PETROLEUM
LIMITED**

**(3) GULF KEYSTONE PETROLEUM
INTERNATIONAL LIMITED**

**(4) GULF KEYSTONE (UK) LIMITED**

**<u>Defendants</u>**

---

**WITNESS STATEMENT
OF
ERIC PUTNAM WEMPEN**

---

Clifford Chance LLP
10 Upper Bank Street
London E14 5JJ

Tel:    0207 006 1000
Fax:    0207 006 5555
Ref:    70-40463155

**Solicitors for the Claimant**